IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

AMERICAN FREE ENTERPRISE
CHAMBER OF COMMERCE,

*Plaintiff,*

v.

ENGINE MANUFACTURERS
ASSOCIATION, D/B/A TRUCK & ENGINE
MANUFACTURERS ASSOCIATION, et al.,

*Defendants.*

Case No. 3:24-cv-50504
District Judge Ian D. Johnston
Magistrate Judge Michael F. Iasparro

## **APPENDIX OF ATTACHED MATERIALS PER STANDING ORDER**

**Contents**

1. *Elorac, Inc. v. Sanofi-Aventis Canada Inc.*, No. 14-CV-1859, 2014 WL 7261279, (N.D. Ill. Dec. 19, 2014)
2. *Imperial Crane Servs., Inc. v. Cloverdale Equip. Co.*, No. 13 C 04750, 2013 WL 5904527, (N.D. Ill. Nov. 4, 2013)

🟨 KeyCite Yellow Flag

Distinguished by United Airlines, Inc. v. Zaman, N.D.Ill., April 30, 2015

2014 WL 7261279

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

ELORAC, INC., Plaintiff,

v.

SANOFI–AVENTIS CANADA INC., Defendant.

Case No. 14–cv–1859
|
Signed December 19, 2014

**Attorneys and Law Firms**

William M. McErlean, Lindsey D.G. Dates, Barnes & Thornburg LLP, Chicago, IL, for Plaintiff.

Raj Niranjan Shah, Eric Michael Roberts, DLA Piper US LLP, Chicago, IL, Christopher Matthew Strongosky, Leeanne Neri, DLA Piper LLP, New York, NY, for Defendant.

*MEMORANDUM OPINION AND ORDER*

AMY J. ST. EVE, District Court Judge:

**\*1** Before the Court is Defendant's motion to dismiss. For the following reasons, the Court denies Defendant's motion.

## BACKGROUND

Plaintiff Elorac, Inc., ("Elorac" or "Plaintiff"), the assignee of all rights previously held by Winston Laboratories, Inc. ("Winston") filed a complaint alleging two counts of breach of contract against Defendant Sanofi–Aventis Canada Inc. ("Sanofi Canada" or "Defendant"), based on (1) failure to pay royalties for net sales (Count I) and (2) failure to use commercially reasonable efforts to commercialize the product (Count II). (*See generally* R.1, Compl.) Elorac

alleges that it is entitled to payments relating to the development, marketing, promotion and sale of a topical cream used to treat osteoarthritis, known as Civamide, under a License Agreement that Winston assigned to Elorac. (R.1, ¶¶ 1, 2.) Sanofi Canada moves to dismiss Elorac's complaint pursuant to Rule 12(b)(2) for lack of personal jurisdiction and Rule 12(b)(3) for improper venue. (*See* Fed. R. Civ. P. 12(b)(2); Fed. R. Civ. P. 12(b)(3); R.22, Defs.' Motion to Dismiss, at 7–15.)

### I. The Parties

Elorac is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Vernon Hills, Illinois. (R.1, Compl., ¶ 3.)[1] Winston, at all times relevant to this dispute, was a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Vernon Hills, Illinois. (R.1, ¶ 5.) Defendant Sanofi–Aventis Canada Inc. ("Sanofi Canada" or "Defendant"), is a corporation organized and existing under the laws of Canada, with its principal place of business located at 2150, Saint Elzear Blvd. West., Laval, Quebec, Canada, H7L 4A8. (R.1, ¶ 6.)

### II. The Product—Civamide Cream

Winston developed pharmaceutical products that treat a wide range of pain indications, including episodic cluster headaches, chronic daily headaches, neuropathic pain, cancer pain, post-operative pain, and osteoarthritis. (R.1, ¶ 9.) Winston developed Civamide, a proprietary compound to treat the symptoms of osteoarthritis. (R.1, ¶ 10.) Civamide is a TRPV–1 receptor modulator and neuronal calcium channel blocker and is the primary active ingredient in a topical cream for treating osteoarthritis ("Civamide Cream"). (R.1, ¶¶ 11, 12.)

### III. The Meetings

In March of 2007, Dr. Joel Bernstein—founder, President, and C.E.O. of Winston[2]—contacted Mr. Anjan Aralihalli—U.S. Director of Business Development for Sanofi–Aventis U.S. ("Sanofi U.S.")—to see whether Sanofi U.S. might be interested in licensing the Civamide Cream. (R.25–1, Bernstein Declaration, ¶ 8; R.22–1, Megyery Declaration, ¶ 4.)

2

Elorac, Inc. v. Sanofi–Aventis Canada Inc., Not Reported in Fed. Supp. (2014)

2014 WL 7261279

During discussions with Sanofi U.S., Mr. Aralihalli informed Dr. Bernstein that Sanofi Canada wanted to talk with him, as it was interested in licensing Winston's Civamide Cream. (R.25–1, ¶ 9.) In July 2007, Dr. Bernstein followed up on Mr. Aralihalli's request and contacted Ms. Manon Decelles—Director of Business Development for Sanofi Canada—to discuss Sanofi Canada's interest in promoting and distributing the Civamide Cream. (R.25–1, ¶ 10.) Ms. Decelles' primary responsibility was to research and identify business development opportunities for Sanofi Canada, she was also responsible for product licensing at Sanofi Canada. (R.22–1, ¶ 3; R.27–1, ¶ 2.)

**\*2** Discussions between Sanofi Canada and Winston continued into 2008. (R.22–1, ¶ 6.) On May 30, 2008, Dr. Bernstein met with Ms. Decelles in Chicago to discuss Sanofi Canada's interest in promoting and distributing the Civamide Cream. (R.1, ¶ 13; R.22–1, ¶ 7.) Sanofi Canada employees were in Chicago during that time to attend the 2008 American Society of Clinical Oncology (ASCO) conference and agreed to also meet with Dr. Bernstein to "continue[ ] assessment of a potential business opportunity." (R.22–1, ¶ 7.) A second meeting occurred during that visit, on June 2, 2008, to again discuss promotion and distribution of the Civamide Cream. (R.1, ¶ 14; R.22–1, ¶ 9.) Sanofi Canada attended this meeting with "the goal of ....get[ting] to know Dr. Bernstein and Winston, understand and confirm, as best possible, the representations regarding Winston and Civamide that Dr. Bernstein had made, and to gain comfort that Winston would be a reliable business partner." (R.22–1, ¶ 9.) At this second meeting, Sanofi Canada presented to Winston representatives, including Dr. Bernstein, its abilities related to selling and promoting the Civamide Cream, emphasizing its market access, sales and marketing expertise, experienced brand management, result-driven sales force, sales support, trade and customer support, trade knowledge, and relationships, launch support, hospital contracts, and competitive sales organization. (R.1, ¶¶ 17, 21; R.22–1, ¶¶ 10, 11; R.25–1, ¶ 14.) During this same meeting, Sanofi Canada also shared with Winston information regarding its budget, employee force, past sales success with other pharmaceutical products, familiarity with marketing osteoarthritis products, as well as predictions relating to anticipated success of Winston's Civamide Cream, including the number of anticipated sales representatives Sanofi Canada would allocate for promoting the Civamide Cream if Sanofi Canada became Winston's licensee. (R.25–1, ¶¶ 19, 20, 22–28.) A third meeting occurred in Chicago on July 3, 2008 between Dr. Bernstein and Mr. Edward Dahl—Director, Mergers & Acquisitions at Sanofi Canada—to discuss ideas for collaboration with Sanofi Canada related to Winston's other dermatologic product formulations. (R.27–1, ¶¶ 3–5.) After the June 2, 2008 meeting, the parties began negotiations, each from

their respective locations, i.e., Sanofi Canada in Quebec, and Winston in Illinois. (R.22–1, ¶ 12.)

On July 24, 2008, Dr. Bernstein again met with Ms. Decelles in Chicago to negotiate and finalize terms of an agreement-in-principle between Winston and Sanofi Canada, which was necessary before an actual written agreement could be drafted. (R.25–1, ¶ 16; R.22–1, ¶ 13.) During this meeting, discussions focused on areas that became key terms of the potential license agreement, and the attendees agreed to, among other things: (i) the scope of the license; (ii) the development process; (iii) the manufacturing and supply process; (iv) how to calculate the purchase price; (v) Sanofi Canada's obligations with respect to promoting and marketing the Civamide Cream; (vi) a signing fee; (vii) milestone royalty payments; (viii) performance payments; (ix) royalty payments; and (x) payment terms. (R.25–1, ¶ 16.) In the months that followed, the parties worked to document formally the agreements that they reached during the July 24, 2008 meeting. (R.25–1, ¶ 17; R.22–1, ¶ 12.)

## IV. The License Agreement

A few months later, on October 30, 2008, Sanofi Canada and Winston subsequently executed a license agreement pertaining to Winston's Civamide Cream (the "License Agreement"). (R.1, ¶ 31; R.22–1, ¶ 15; *see generally,* R.1–1, License Agreement.) The License Agreement granted Sanofi Canada the exclusive right to develop, manufacture, and commercialize the Civamide Cream (as well as a second generation cream) in Canada. (R.1, ¶¶ 32, 33; R.22–1, ¶ 20.) The License Agreement included terms relating to Sanofi Canada's agreement to use commercially reasonable efforts to commercialize the product in Canada. (R.1, ¶¶ 34–37.) Other "material aspects" of the License Agreement included Winston's obligations to develop, obtain regulatory approval, and manufacture Civamide Cream. (R.22–1 ¶ 21; R.1–1, §§ 3, 4.) The License Agreement required Sanofi Canada to use good faith efforts consistent with (i) those generally utilized by similarly sized companies with respect to their own internally developed pharmaceutical products with similar market potential and (ii) Sanofi Canada's past marketing and sales practices, to sell, offer for sale, import, export, transport, register, distribute, promote, and market the Civamide Cream in Canada. (R.1, ¶ 38.) Sanofi Canada also agreed to pay royalties for its exclusive license with respect to the Civamide Cream. (R.1, ¶¶ 39–42.) The License Agreement contains a forum selection clause in Article 15, entitled "Governing Law and Dispute Resolutions" that states:

Elorac, Inc. v. Sanofi–Aventis Canada Inc., Not Reported in Fed. Supp. (2014)

2014 WL 7261279

15.1 **Governing Law**—This Agreement shall be governed by and construed in accordance with the laws in force in the State of New York, without reference to its conflict of laws principles.

15.2 **Disputes**—Unless otherwise set forth in this Agreement, in the event of a dispute arising out of or under this Agreement between the Parties, such dispute shall be referred to the respective executive officers of the Parties or their designees, for good faith negotiations attempting to resolve the dispute.

**\*3** ...

15.3 Should the Parties fail to agree on ways to resolve the dispute within thirty (30) days of the notice sent by one Party to the other, than the party having sent the *notice shall be entitled* to seek redress from the Courts of the State of New York.

(R.22–1, ¶ 22; R.1–1, at 30, § 15.1–15.2 (emphasis in original), § 15.3 (emphasis added).) Winston subsequently assigned the License Agreement to Elorac on October 11, 2012. (R.1, ¶ 68.)

## V. The Dispute

In the years following entry of the License Agreement, Winston and Sanofi Canada met to discuss Winston's concerns with Sanofi Canada's performance. In May 2009, Dr. Bernstein and Ms. Decelles met in Atlanta during a conference to discuss Sanofi Canada's performance obligations. (R.25–1, ¶ 22b.) Winston's problems with Sanofi Canada's performance under the License Agreement continued after Winston received regulatory approval for its Civamide Cream in Canada. (R.1, ¶¶ 43, 44; R.22–2, ¶¶ 3, 5.) On August 3, 2010, Sanofi Canada informed a Winston consultant that it no longer planned to market the Civamide Cream and would be "out-licensing the product to a third party." (R.1, ¶¶ 45, 46.) After being notified of this development, Winston contacted Sanofi Canada to object to the transfer of its obligations to a third party. (R.1, ¶¶ 47, 48.) Over the next months, Winston continued to complain about Sanofi Canada's failure to commercialize the Civamide Cream and sent formal notice identifying three issues upon which it would seek redress. (R.1, ¶¶ 49, 50.) Namely, Winston inquired concerning: (i) launching of the Civamide Cream in Canada, (ii) payment of regulatory approval expenses, and (iii) Sanofi's failure to provide market research studies. (R.1, ¶ 51.) After addressing these issues in a conference call on December 8, 2010, Sanofi Canada agreed to (i) launch the Civamide Cream in early to mid-April of 2011;

(ii) pay 50% of certain development costs; and (iii) inquire with legal counsel regarding the market research studies. (R.1, ¶ 54.) Sanofi Canada did not perform as agreed. (R.1, ¶ 55.)

On July 18, 2011, without consulting Winston, Sanofi Canada informed Winston that Valeant International ("Valeant") would be taking over Sanofi Canada's marketing and sales responsibilities with respect to the Civamide Cream. (R.1, ¶ 56.) On August 15, 2011, Winston notified Sanofi Canada of its alleged breach of the License Agreement, including Sanofi Canada's failure to disclose the rights and obligations transferred to Valeant and whether Valeant planned to abide by the terms of the License Agreement. (R.1, ¶ 59.) After additional disagreements, including Winston's request for Sanofi Canada's assistance in requesting removal of an indication for the Civamide Cream that limited its use to "no more than three months," Winston sent a letter to Sanofi Canada identifying seven alleged breaches pursuant to the Notice provision of Section 14.2 of the License Agreement. (R.1, ¶¶ 61–66.)

A number of face-to-face meetings were held to discuss Winston's allegations of breach during the License Agreement, including a one-day meeting in Chicago. In October 2011, Dr. Bernstein and other Winston representatives met in New York with Thomas DeRosier—General Counsel of Sanofi North America—and other representatives to discuss Sanofi Canada's performance. (R.25–1, ¶ 22c.) On December 10, 2012, a meeting was held in Chicago between Elorac, Winston representatives—including Dr. Bernstein—and Jon Fairest (President of Sanofi Canada), Pat Papillo (C.F.O. of Sanofi Canada), and To–Dong Sec (Business Development, Sanofi Canada). (R.25–1, ¶ 22d.) After the December 10 meeting, Sanofi Canada agreed to apply to Health Canada for the label modification and provided information pertaining to Valeant's plans to promote the Civamide Cream. (R.1, ¶¶ 70–73.) Sanofi Canada later instructed Elorac to prepare the regulatory submission and upon its receipt, Sanofi Canada submitted it to Health Canada and notified Elorac of the submission evalution fee that would be necessary to ensure evaluation of the submission. (R.1, ¶¶ 74–78.)

**\*4** On November 26, 2013, Sanofi Canada informed Elorac that Valeant had stopped promoting the Civamide Cream altogether. (R.1, ¶ 79.) On March 17, 2014, Elorac filed its Complaint alleging Sanofi Canada breached the License Agreement. (*See generally,* R.1.)

## LEGAL STANDARD

Elorac, Inc. v. Sanofi–Aventis Canada Inc., Not Reported in Fed. Supp. (2014)

2014 WL 7261279

improper venue as do a Rule 12(b)(2) dismissal). *Id.*

## I. Rule 12(b)(2)—Lack of Personal Jurisdiction

A motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) tests whether a federal court has personal jurisdiction over a defendant. *See* Fed. R. Civ. P. 12(b)(2); *Central States v. Phencorp. Reins. Co.,* 440 F.3d 870, 875 (7th Cir. 2006). In ruling on a Rule 12(b)(2) motion, courts may consider matters outside of the pleadings. *See Purdue Research Found. v. Sanofi–Synthelabo, S.A.,* 338 F.3d 773, 782 (7th Cir. 2003). When a court determines a Rule 12(b)(2) motion based on the submission of written materials without holding an evidentiary hearing, as is the case here, the plaintiff must make a prima facie case of personal jurisdiction. *See uBID, Inc. v. GoDaddy Grp., Inc.,* 623 F.3d 421, 423–34 (7th Cir. 2010); *GCIU–Emp'r Ret. Fund v. Goldfarb Corp*., 565 F.3d 1018, 1023 (7th Cir. 2009). As such, the plaintiff bears the burden of establishing that personal jurisdiction exists. *See uBID,* 623 F.3d at 423–34; *GCIU–Emp'r Ret. Fund,* 565 F.3d at 1023. To determine whether the plaintiff has met its burden, the court may consider affidavits from both parties. *Felland v. Clifton,* 682 F.3d 665, 672 (7th Cir. 2012). When the defendant challenges by declaration a fact alleged in the plaintiff's complaint, the plaintiff has an obligation to go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction. *Purdue Research Found.,* 338 F.3d at 783. Courts must also resolve all factual disputes in the plaintiff's favor. *See GCIU–Emp'r Ret. Fund,* 565 F.3d at 1020, n.1. Unrefuted facts in defendant's affidavits, however, will be taken as true. *Id.* While in this context affidavits trump the pleadings, in the end all facts disputed in the affidavits will be resolved in the plaintiff's favor. *Purdue Research Found.,* 338 F.3d at 782.

## II. Rule 12(b)(3)—Improper Venue

In deciding a motion to dismiss for improper venue under Federal Rule of Civil Procedure 12(b)(3), all allegations are taken as true, unless contradicted by the defendant's affidavits and the court may consider facts outside the pleadings. *See Faulkenberg v. CB Tax Franchise Sys., LP,* 637 F.3d 801, 806 (7th Cir. 2011). Courts must resolve any conflicts in the affidavits regarding relevant facts in plaintiff's favor. *See Purdue Research Found.,* 338 F.3d at 782. The Seventh Circuit has cautioned that "once the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Id.* at 783; *see also Faulkenberg,* 637 F.3d at 806 (noting that the same standards apply to

## ANALYSIS

### I. Personal Jurisdiction—Minimum Contacts with Illinois

When, as here, the Court's subject matter jurisdiction is based on diversity of citizenship, the Court may exercise personal jurisdiction over a defendant only if personal jurisdiction would be proper in an Illinois court. *Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 713 (7th Cir. 2002); *Jennings v. AC Hydraulic A/S,* 383 F.3d 546, 548 (7th Cir. 2004). A court's exercise of jurisdiction over a defendant must be authorized by the terms of the forum state's personal jurisdiction statue and also must comport with the requirements of the Fourteenth Amendment's Due Process Clause. *Felland,* 682 F.3d at 672 (citing *Tamburo v. Dworkin,* 601 F.3d 693, 700 (7th Cir. 2010)); *see also uBID,* 623 F.3d at 425; *Northern Grain Mktg., LLC v. Greving,* 743 F.3d 487, 492 (7th Cir. 2014). The Illinois long-arm statute permits a court to exercise personal jurisdiction "on any ... basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2–209(c). Because the Seventh Circuit has held that "there is no operative difference between those two constitutional limits," the Court will "proceed to the question of whether the exercise of personal jurisdiction would violate federal due process." *See Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.,* 623 F.3d 440, 443 (7th Cir. 2010) (citations omitted); *Russell v. SNFA,* 987 N.E.2d 778, 785–86 (Ill. 2013).

**\*5** For a court to exercise personal jurisdiction over an out-of-state defendant, the key issue for constitutional purposes is whether the defendant has sufficient "minimum contacts" with the forum state such that "the maintenance of the suit 'does not offend traditional notions of fair play and substantial justice.' " *Mobile Anesthesiologists Chicago,* 623 F.3d at 443; *see also Tamburo,* 601 F.3d at 701 (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

Personal jurisdiction may be either general or specific. *See Advanced Tactical Ordnance Sys., LLC v. Real Action,* 751 F.3d 796, 800 (7th Cir. 2014) (citing *Daimler AG v. Bauman,* ––– U.S. ––––, 134 S.Ct. 746, 753, 187 L.Ed.2d 624 (2014)).

Elorac, Inc. v. Sanofi–Aventis Canada Inc., Not Reported in Fed. Supp. (2014)

2014 WL 7261279

**A. General Jurisdiction**

"A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Daimler AG,* 134 S.Ct. at 754 (quoting *Goodyear,* —— U.S. ——, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011)); *see also Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. at 408, 414, n.9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Advanced Tactical Ordnance,* 751 F.3d at 800. If such contacts exist, "the court may exercise personal jurisdiction over the defendant even in cases that do not arise out of and are not related to the defendant's forum contacts." *Hyatt Int'l Corp.,* 302 F.3d at 713.

Sanofi Canada argues that general jurisdiction cannot exist over it because it is not fairly regarded as "at home" in Illinois. *See Daimler AG,* 134 S.Ct. at 749. Elorac does not argue that the Court has general jurisdiction over Sanofi Canada, nor has it alleged or offered facts sufficient to establish that Sanofi Canada had "continuous and systematic" contacts that render it essentially "at home" in Illinois. *See id.* Accordingly, the Court turns to the issues of specific personal jurisdiction over Sanofi Canada.

**B. Specific Jurisdiction**

The exercise of specific jurisdiction over a defendant requires a plaintiff to show that the alleged controversy between the parties "arises out of the forum-related activity." *Advanced Tactical Ordnance,* 751 F.3d at 800. The Seventh Circuit recently provided guidance on the requirements for specific jurisdiction, stating:

> Nearly 70 years ago, the Supreme Court held that due process is satisfied for this purpose so long as the defendant had "certain minimum contacts" with the forum state such that the "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). *Walden* serves as a reminder that the inquiry has not changed over the years, and that it applies to intentional tort cases as well as other. *See* [*Walden v. Fiore,* —— U.S. ——, 134 S.Ct. 1115, 1119, 188 L.Ed.2d 12 (2014)].

The relevant contacts are those that center on the relations among the defendant, the forum, and the litigation. *Id.* (citing *Keeton v. Hustler Mag., Inc.,* 465 U.S. 770, 775, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). Crucially, not just any contacts will do: "For a State to exercise jurisdiction consistent with due process, the defendant's *suit-related* conduct must create a substantial connection with the forum State." *Id.* at 1121 (emphasis added). The "mere fact that [defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction." *Id.* at 1126. Furthermore, the relation between the defendant and the forum "must arise out of contacts that the 'defendant *himself*' creates with the forum...." *Id.* at 1122 (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). Contacts between the plaintiff or other third parties and the forum do not satisfy this requirement. *Id.*; *see Walden,* 134 S.Ct. at 1122.

**\*6** *Advanced Tactical,* 751 F.3d at 800–01; *see also Tamburo,* 601 F.3d at 702; *Purdue Research Found.,* 338 F.3d at 780–81. Consistent with these principles, courts apply a three-part analysis in determining whether specific jurisdiction exists:

> (1) the defendant must have purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities to the state;

> (2) the alleged injury must have arisen from the defendant's forum-related activities; and

> (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice.

*See Gilman Opco LLC v. Lanman Oil Co., Inc.,* 2014WL1284499, at \*4 (citing *Felland,* 682 F.3d at 673 (citations omitted); *see also Northern Grain Mktg.,* 743 F.3d at 492 (quoting *Tamburo,* 601 F.3d at 702)).

Elorac argues that the Court has personal jurisdiction over Sanofi Canada because of its substantial contacts with Illinois as exhibited by, among other things: (i) hundreds of e-mails, letters and phone calls that Sanofi Canada has directed to Winston/Elorac at its headquarters in Vernon Hills, Illinois; (ii) the trips to Illinois by Sanofi Canada employees for face-to-face negotiation meetings; (iii) the July 24, 2008, Chicago, Illinois meeting wherein the parties agreed to all of the key terms in the Agreement; and (iv) the performance required by the License Agreement. (R.25, Pltf.'s Resp., at 4–15.) Defendant argues that the Court does not have personal jurisdiction over it through the substantial contacts analysis. It further contends that the forum selection clause selecting New York demonstrates a

Elorac, Inc. v. Sanofi–Aventis Canada Inc., Not Reported in Fed. Supp. (2014)

2014 WL 7261279

negotiated effort that Sanofi Canada recognized it would not subject itself to jurisdiction in Illinois, and the New York forum provides a fair compromise between an Illinois party and a Montreal-based company. (R.27, Def.'s Reply, at 4–14.)


### 1. Sanofi Canada Purposefully Availed Itself to Illinois Based on Its Sufficient Contacts With Illinois

In a case involving a contract dispute, courts must view "the contract in the context of the entire transaction of which it is a part," since the simple act of contracting between an in-state and out-of-state party does not, alone, provide sufficient minimum contacts. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 478–79, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *see also Northern Grain Mktg.,* 743 F.3d 487, 493 (7th Cir. 2014) (quoting *Purdue Research Found.,* 338 F.3d at 781) ("With respect to contract disputes, 'contracting with an out-of-state party alone cannot establish automatically sufficient minimum contacts in the other party's home forum' "); *Citadel Grp. Ltd. v. Wa. Reg'l Med. Ctr.,* 536 F.3d 757, 763 (7th Cir. 2008) ("[T]he formation of a contract alone is not sufficient to confer personal jurisdiction"); *Corus Int'l Trading Ltd. v. Eregli Demir ve Celik Fabrikalari, T.A.S.,* 765 F.Supp.2d 1079, 1084–85 (N.D.Ill. 2011).

Instead, courts "conduct a context-sensitive analysis of the contract, examining 'prior negotiations, contemplated future consequences, the terms of the contract, and the parties' course of actual dealing with each other.' " *Northern Grain Mktg.,* 743 F.3d at 493; *see also Citadel,* 536 F.3d at 761 (citing *Burger King,* 471 U.S. at 478–79). Courts in this District routinely look to factors including "who initiated the transaction, where the negotiations were conducted, where the parties executed the contract, and where the defendant would have performed the contract." *Corus Int'l Trading,* 765 F.Supp.2d at 1085. While no one factor is dispositive, the crucial question ultimately is whether Sanofi Canada should have "reasonably anticipate[d] being haled into court" in Illinois. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 287 (1980). The alleged contacts related to these factors support the Court's specific jurisdiction over Sanofi Canada in this case.

**\*7** The facts, taken in the light most favorable to Elorac, demonstrate that numerous face-to-face meetings occurred between the parties prior to signing the License Agreement that dealt with the relationship between the parties, as represented in the License Agreement. On at least three occasions, Sanofi Canada met with Winston representatives[3] in

Chicago, Illinois to discuss Sanofi Canada's interest in promoting and distributing the Civamide cream (*see* R.25–1, ¶¶ 13–15). During another meeting with Sanofi Canada in Chicago to discuss, among other things, Winston's Civamide Cream, Sanofi Canada's Vice President suggested broadening the scope of the discussions to include additional uses for the cream (e.g., for treating psoriasis). (*See* R.25–1, ¶¶ 15, 29f.) On July 24, 2008, about three months prior to signing the License Agreement, Ms. Decelles of Sanofi Canada and Dr. Bernstein of Winston met in Chicago to negotiate the terms of the License Agreement, including: (i) the scope of the license; (ii) the development process; (iii) the manufacturing and supply process; (iv) how to calculate the purchase price; (v) Sanofi Canada's obligations with respect to promoting and marketing the Civamide Cream; (vi) a signing fee; (vii) milestone royalty payments; (viii) performance payments; (ix) royalty payments; and (x) payment terms. (*See* R.25–1, ¶ 16.) Because the provisions of the License Agreement were so heavily negotiated in Chicago at this meeting, it becomes more significant in the jurisdictional analysis. *See Torco Oil Co. v. Innovative Thermal Corp.,* 730 F.Supp. 126, 132 (N.D.Ill. 1989) (finding that a single meeting in Illinois "in furtherance of the contract, [ ] is the most significant jurisdictional fact that supersedes all other considerations" where the parties discussed the contract in detail and agreed upon revisions).

Sanofi Canada argues that, at most, the negotiations included "one meeting in the forum state to settle upon an agreement-in-principle," but then asserts that reliance on these negotiations demonstrates that Elorac's cause of action did not "arise from" that meeting because of the License Agreement's integration clause. (*See* R.22, at 12.) Sanofi Canada implies that the License Agreement's integration clause forecloses Elorac's reliance on any representations made prior to entering into the License Agreement. (*Id.* at 11–12.) In support of this theory, Sanofi Canada generally cites a 1985 New York appellate case finding a merger clause foreclosed defendants from relying on oral representations during negotiations to create a genuine issue of material fact. (*Id.*) This case, however, is inapplicable to the situation here in which Elorac relies on Sanofi Canada's conduct during contract negotiations and the relationship of such conduct to Illinois, not the actual representations made during those negotiations. The Supreme Court has clearly established that prior negotiations are relevant in determining whether sufficient minimum contacts exist. *Burger King,* 471 U.S. at 478; *see Citadel,* 536 F.3d at 761 (citing *Burger King,* 471 U.S. at 478) ("[W]e consider the parties' 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing' in determining whether there were sufficient minimum contacts"); *see also Wilson v.*

Elorac, Inc. v. Sanofi–Aventis Canada Inc., Not Reported in Fed. Supp. (2014)

2014 WL 7261279

*Humphreys (Cayman) Ltd.,* 916 F.2d 1239, 1245 (7th Cir. 1990) (citing *Neiman v. Rudolf Wolff & Co.,* 619 F.2d 1189, 1193 (7th Cir. 1980)) (personal jurisdiction established where employee of defendant [an English company] came to forum for a lunch meeting, and meeting constituted bulk of negotiations that led to formation of contract; "A defendant's participation in the state in substantial preliminary negotiations leading to the contract in issue has been held a sufficient basis for long-arm jurisdiction").

The parties also had numerous face-to-face meetings in Chicago, Illinois after the signing of the agreement. In 2008, shortly after the parties signed the License Agreement, Sanofi Canada attended meetings in Chicago with Winston and Sanofi U.S. to discuss whether Sanofi U.S. could manufacture the Civamide with the goal of reducing the costs of the Civamide Cream for Sanofi Canada. (*See* R.25–1, ¶ 22a; *id.,* Ex. B (emails between Winston and Sanofi U.S. proposing dates for a meeting in Illinois).) Additional meetings occurred in 2009, 2011, and 2012 between the parties, including in Atlanta, New York, and Chicago to address Sanofi Canada's alleged failure to perform its obligations under the License Agreement. (*See* R.25–1, ¶¶ 22b, 22c, 22d.) These meetings provide a contact between Sanofi Canada and Illinois, contemplated by the relationship with Winston. *See Abbott Labs., Inc. v. BioValve Techs., Inc.* 543 F.Supp.2d 913, 923 (N.D.Ill. 2008) ("Biovalve") (citing *Wisc. Elec. Mfg. Co. v. Pennant Prods., Inc.,* 619 F.2d 676, 678 (7th Cir. 1980)) (finding that non-resident defendant's visits to Illinois during the course of the contract's performance supported exercise of personal jurisdiction over defendant)).

*8 In addition to Sanofi Canada's in-person visits to Illinois, the evidence viewed in the light most favorable to Elorac shows that Sanofi Canada engaged in numerous e-mails, letters, and phone calls to Winston in Vernon Hills, Illinois, both before and after signing the License Agreement. (*See* R.25–1, ¶ 11, 17; R.22–1, ¶ 6.) These contacts demonstrate the parties' actual course of dealing and are sufficient for finding specific jurisdiction. *See Burger King,* 471 U.S. at 478 (explaining that courts should consider contemplated future consequences and the parties' actual course of dealing in determining whether sufficient minimum contacts exist); *Heritage House Rests., Inc. v. Cont'l Funding Grp., Inc.,* 906 F.2d 276, 283–84 (7th Cir. 1990) (personal jurisdiction existed where defendants "reached out" to plaintiffs through telephone calls and mailings); *see also YES Lifts, LLC v. Normal Indus. Materials, Inc.,* No. 10 C 4828, 2011 WL 1770458, at *4 (N.D.Ill. May 9, 2011) (same); *WAV, Inc. v. Walpole Island First Nation,* —— F.Supp.2d ——, No. 13 C 09133, 2014 WL 2566842, at *4 (N.D. Ill. June 6, 2014) (personal jurisdiction existed where phone, email, and in-person contacts

occurred between the parties over the course of two years). Even without a physical presence in Illinois, email, mail, and phone communication may establish minimum contacts, especially as relating to interstate commercial contracts. *See Northern Grain Mktg.,* 743 F.3d at 493 (citing *Purdue Research,* 338 F.3d at 781) (explaining that so long as a defendant's efforts are purposefully directed toward residents of the forum state, "the fact that the defendant hasn't physically entered it does not defeat personal jurisdiction."); *Heritage House Rests.,* 906 F.2d at 283 (observing that defendant "created a relationship which is naturally based on telephone and mail contacts rather than physical presence, and it should not be able to avoid jurisdiction based on that distinction").

Furthermore, Sanofi Canada made multiple payments to Winston related to the License Agreement and deposited money into Winston's account at the Private Bank and Trust Company within this District. (*See* R.25–1, ¶¶ 23a, 23c, 23e, 23g; R.22–2, To–Dong Sec Declaration, ¶ 6.) *See Preussag Int'l Steel Corp. v. Ideal Steel & Builders' Supplies, Inc.,* 2004 WL 783102, at *4 (N.D.Ill. Jan. 21, 2004) (due process satisfied where defendant contacted plaintiff by mail and telephone to place orders, dispute invoices, negotiate terms, and submit payment). Although communications and payments into a forum state, standing alone, are insufficient to establish specific jurisdiction, this is true only where a contract was neither performed nor negotiated in the forum, which is not the case here. *See Federated Rural Elec. Ins. Corp. v. Inland Power & Light Co.,* 18 F.3d 389, 395 (7th Cir. 1994) ("making telephone calls and mailing payments into the forum state are insufficient bases for jurisdiction"). Accordingly, the payments Sanofi Canada made to Illinois represent additional jurisdictional contacts between Defendants and the forum state.

Additionally, the License Agreement also contemplated a relationship between the parties that, unless otherwise terminated, would last at least fifteen (15) years, with automatic renewal for successive five (5) year periods thereafter. (*See* R.1–1, § 14.1 (Agreement Term).) These contract terms agreed to by the parties demonstrate that Sanofi Canada deliberately entered into a long-term contractual relationship with Winston, a Vernon Hills, Illinois company, and purposefully availed himself of the privilege of conducting business in Illinois. *See Purdue Research Found.,* 338 F.3d at 785 (quoting *Burger King,* 471 U.S. at 480) (finding personal jurisdiction over defendant's predecessor to cooperative research agreement because the agreement clearly "envisioned continuing and wide-reaching contacts" between the parties); *see also WAV, Inc.,* 2014 WL 2566842, at *4 (relying on the five-year term of the Agreement as a jurisdictional contact that shows defendant com-

Elorac, Inc. v. Sanofi–Aventis Canada Inc., Not Reported in Fed. Supp. (2014)

2014 WL 7261279

mitted to continuing a long-term relationship with plaintiff's Illinois business); *Engineered Med. Sys., Inc. v. Despotis,* No. 1:05–CV0170–DFH–TAB, 2005 WL 2922448, at *3 (S.D.Ind. Nov. 4, 2005) (citing *Burger King,* 471 U.S. at 473) ("[W]e have emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities").

**\*9** Regarding initiation of the transaction at issue, the facts viewed in the light most favorable to Elorac demonstrate that it was Sanofi Canada who provided its contact information to Sanofi U.S.—to, in turn, provide it to Winston. Although Winston initially reached out to Sanofi U.S., it was only after Sanofi Canada learned of Winston's Civamide Cream from Sanofi U.S. and expressed its desire to discuss a license that the parties to the litigation actually connected. Upon making contact with Sanofi Canada, Winston entered into initial conversations and meetings that spawned the License Agreement at issue. Although the Court recognizes that Sanofi Canada did not directly initiate the transaction, the facts still demonstrate Sanofi Canada's intent to engage in direct communication with an Illinois company.

Sanofi Canada argues the License Agreement was not executed in Illinois and that its performance under the License Agreement was limited to Canada and had no contacts in Illinois, preventing the exercise of personal jurisdiction. (*See* R.22, at 13–14.) Despite the fact that the License Agreement limited performance to the "Territory"—Canada (*see* R.1–1, §§ 1.52, 6.1), the facts viewed in the light most favorable to Elorac demonstrate that Sanofi Canada was well aware that Winston had obligations to perform in Illinois that were negotiated and agreed to in the License Agreement. (*See* R.22–1, ¶ 21 (discussing "material aspects of the License Agreement related to Winston's obligations to develop, obtain regulatory approval, and manufacture Civamide cream"); *see also* R.1–1, §§ 3, 4.) Sanofi Canada's awareness of these obligations for agreed performance in Illinois during contract negotiations makes contractual performance by Winston an additional contact considered by the Court. *See BioValve,* 543 F.Supp.2d 913, 920 (N.D.Ill. 2008) (finding defendant was not subject to jurisdiction because there was no evidence or argument that it knew the contract would be performed by plaintiff in Illinois, but acknowledging that 'if the contract explicitly contemplated [plaintiff's] performance in Illinois [it] might be a significant consideration"). These contacts, along with the additional contacts discussed above, demonstrate more than sufficient bases for the exercise of personal jurisdiction over Sanofi Canada in regard to this dispute over the License Agreement with Winston/Elorac.

### 2. Elorac's Breach of Contract Claim Arises Out of Sanofi Canada's Contacts with Illinois

Plaintiff must also demonstrate that the cause of action arises out of or directly relates to those activities directed at Illinois. *See Advanced Tactical Ordnance,* 751 F.3d at 800. Elorac has demonstrated that the contacts with Illinois are directly related to Winston/Elorac and Sanofi Canada's relationship regarding the development, marketing, promotion and sale of Winston's topical osteoarthritis cream, Civamide Cream. This relationship is memorialized by the License Agreement, which is at the heart of Elorac's breach of contract claim. While true that Sanofi Canada's performance under the contract included Sanofi Canada's performance outside of Illinois, multiple communications and meetings regarding the License Agreement between the parties occurred in Illinois, Winston's agreed contractual performance occurred in Illinois, and Sanofi Canada's failure to pay under the License Agreement should have included additional payments into Illinois banks. Therefore, the Court finds that the substantive legal dispute arises out of the relevant contacts with Illinois. As such, Elorac's breach of contract claim arises out of or relates to the contacts that have been found to be sufficient for exercise of personal jurisdiction in the forum state. *See uBID,* 623 F.3d at 429 (quoting *Burger King,* 471 U.S. at 472–72).

### 3. Exercising Jurisdiction Over Sanofi Canada Does Not Offend Traditional Notions of Fair Play and Substantial Justice

**\*10** Even if the plaintiff meets purposeful availment and specific jurisdiction requirements, the Court also must consider whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice." *Burger King,* 471 U.S. at 476 (quoting *Int'l Shoe,* 326 U.S. at 320). "Thus, courts in 'appropriate cases' may evaluate 'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the interstate judicial system's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and 'the shared interest of the several States in furthering fundamental substantive social policies.' " *Burger King,* 471 U.S. at 477 (quoting *World–Wide Volkswagen,* 444 U.S. at 292). These considerations are sometimes used to establish the reasonableness of jurisdiction in lieu of a strong showing of minimum contacts. *Burger King,* 471 U.S. at 477

Elorac, Inc. v. Sanofi–Aventis Canada Inc., Not Reported in Fed. Supp. (2014)

2014 WL 7261279

(citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 780 (1984)). Once plaintiff presents evidence of minimum contacts, it becomes a defendant's job to show that traditional notions of fair play and substantial justice would be offended if the defendant were haled into the forum. *Burger King,* 471 U.S. at 477 ("[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable"). Sanofi Canada has not met its burden.

The exercise of the Court's specific jurisdiction over Sanofi Canada will not offend traditional notions of fair play and substantial justice. *See Burger King,* 471 U.S. at 476 (quoting *Int'l Shoe,* 326 U.S. at 320). Sanofi Canada does not present a compelling case that jurisdiction in this District would be unreasonable. *See id.* The parties do not suggest that the number of witnesses will be particularly large or that discovery will be particularly complex due to the geography, much less that the process would be easier overall if the case were litigated elsewhere, all of which are factors that bear on the analysis. *See C.H. Johnson Consulting, Inc. v. Roosevelt Roads Naval Stations Lands and Facilities Redevelopment Authority,* No. 1:12–cv–08759, 2013 WL 5926062, at *6 (N.D.Ill. Nov. 5, 2013). Additionally, Elorac has a strong interest in obtaining effective relief and the state of Illinois has a "manifest interest" in providing one of its corporations a forum in which to seek that relief. *Burger King,* 471 U.S. at 473. This District is a proper venue for this case (*see infra,* Analysis, II), and the Court does not find that the burden of defending in Illinois is substantial enough to outweigh the otherwise strong interests allowing for jurisdiction in Illinois.

Taken together, the above contacts and relationship between the parties demonstrate that the Court has sufficient minimum contacts to exercise personal specific jurisdiction over Sanofi Canada in this case that is consistence with federal Due Process.[4]

## II. Improper Venue—Enforcement of the Forum Selection Clause

Sanofi Canada's motion to dismiss pursuant to Rule 12(b)(3) seeks enforcement of the forum selection clause in the License Agreement. As the Supreme Court has addressed, however, the proper procedure for enforcement of a valid forum selection clause is not necessarily dismissal under 12(b)(3) because a forum selection clause does not render venue in a court "improper." *See Atlantic Marine Const. Co., Inc. v. United States Dist. Court for the Western*

*Dist. of Tex.,* ––– U.S. ––––, 134 S.Ct. 568, 579, 187 L.Ed.2d 487 (2013). The question of whether venue is "wrong" or "improper" is generally governed by 28 U.S.C. § 1391. *Id.* at 577. A valid forum selection clause originating in a proper venue is, therefore, enforced through 28 U.S.C. § 1404(a) if it designates a federal forum, or through the doctrine of *forum non conveniens* if it designates a state or nonfederal forum. *See id.* at 580. If the valid selection clause originates in an improper venue, it is enforced by either a dismissal under Rule 12(b)(3) and/or a transfer under 28 U.S.C. § 1406. *See id.* at 575; *see also In re Limit-None, LLC,* 551 F.3d 572, 575–76 (7th Cir. 2008) ("[b]ecause the Northern District of Illinois was not an improper venue, § 1404(a), rather than § 1406(a) provided the authority for the transfer order").

**\*11** The License Agreement entered into by Winston and Sanofi Canada contains a forum selection clause. (*See* R.1–1, § 15.) The forum selection clause is contained in Article 15 of the License Agreement, entitled "Governing Law and Dispute Resolutions" that states:

> 15.1 **Governing Law**—This Agreement shall be governed by and construed in accordance with the laws in force in the State of New York, without reference to its conflict of laws principles.

> 15.2 **Disputes**—Unless otherwise set forth in this Agreement, in the event of a dispute arising out of or under this Agreement between the Parties, such dispute shall be referred to the respective executive officers of the Parties or their designees, for good faith negotiations attempting to resolve the dispute.

> ...

> 15.3 Should the Parties fail to agree on ways to resolve the dispute within thirty (30) days of the notice sent by one Party to the other, than the party having sent the *notice shall be entitled* to seek redress from the Courts of the State of New York.

(R.1–1, at 30, § 15.1–15.2 (emphasis in original), § 15.3 (emphasis added).) The Court turns first to the validity and scope of the forum selection clause, followed by a determination of whether the venue properly lies in the Northern District of Illinois for Plaintiff's claims and whether a transfer is warranted in this case.

### A. The Forum Selection Clause is Valid and Permissive

Elorac, Inc. v. Sanofi–Aventis Canada Inc., Not Reported in Fed. Supp. (2014)

2014 WL 7261279

Sanofi Canada seeks to enforce the clause as the basis for dismissal of the case in the Northern District of Illinois. (*See* R.22, at 14–15; R.27, at 14–15.) Elorac admits that the License Agreement is a "valid and binding agreement" but argues that because the forum selection clause is permissive, the Court should disregard it. (*See* R.25, at 15.)

Although neither party specifically advocates for what law governs, the parties seemingly disagree based on the law cited in their respective briefs. In particular, Sanofi Canada briefly references Seventh Circuit and New York state law (*see* R.22, at 15), while Elorac relies only on Seventh Circuit law regarding the distinction between permissive and mandatory forum selection clauses (*see* R.25, at 15).

The License Agreement's choice of law provision provides for the License Agreement to be "governed by and construed in accordance with the laws of the State of New York,...." (*See* R.1–1, at 30, § 15.1.) Application of a choice of law provision to interpretation of forum selection clauses does no "more than give effect to the legitimate expectations of the parties, manifested in their freely negotiated agreement." *See Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 12, 92 S.Ct. 1907, 1907, 32 L.Ed.2d 513 (1972). Indeed, the Seventh Circuit guides the Court to follow New York law for determining the forum selection clause's meaning and scope. *See Abbott Labs. v. Takeda Pharm. Co.,* 476 F.3d 421, 423 (7th Cir. 2007) ("Simplicity argues for determining the validity and meaning of a forum selection clause, in a case in which interests other than those of the parties will not be significantly affected by the choice of which law is to control, by reference to the law of the jurisdiction whose law governs the rest of the contract in which the clause appears").

Application of New York law also comports with the Second Circuit's and New York State's guidance on choice of law provisions governing forum selection clauses. *See Martinez v. Bloomberg LP,* 740 F.3d 211, 218 (2d Cir. 2014) (citations omitted) (explaining that while federal law governs the enforceability of an otherwise mandatory and applicable forum selection clause, the law contractually selected by the contracting parties governs "whether a particular forum selection clause is mandatory or permissive ... or whether its scope encompasses the claims or parties involved in a certain suit"); *Brooke Grp. Ltd. v. JCH Syndicate 488,* 663 N.E.2d 635, 637 (N.Y. 1996) ("It is now recognized that parties to a contract may freely select a forum which will resolve any disputes over the interpretation or performance of the contract' ").

**\*12** The Court must first determine, under New York law, whether the forum selection clause of the License Agreement is permissive or mandatory. *See Boss v. Am. Express*

*Fin. Advisors, Inc.,* 844 N.E.2d 1142, 6 N.Y.3d 242, 245 (2006) (recognizing both permissive and mandatory nature of forum selection clauses); *see also AVC Nederland B.V. v. Atrium Inv. P'ship,* 740 F.2d 148, 156 (2d Cir. 1984). As with all cases involving contract interpretation, the words and phrases used by the parties govern the interpretation of the permissive or mandatory nature of a forum selection clause, and courts give them their plain meaning. *Brooke Grp.,* 663 N.E.2d at 638.

Under New York law, a forum selection clause is permissive and will not be enforced when the parties only specify jurisdiction "without some further language indicating the parties' intent to make jurisdiction exclusive." *Fear & Fear, Inc. v. N.I.I. Brokerage, L.L.C.,* 851 N.Y.S.2d 311, 313 (N.Y. App. Div. 2008); *see also e.g., Brooke Grp.,* 663 N.E.2d at 638 (permissive forum selection clause providing "in the event of the failure of ... the underwriters will at the request of the Insured ... submit to the jurisdiction of a Court of competent jurisdiction within the United States"); *Columbia Cas. Co. v. Bristol–Myers Squibb Co.,* 635 N.Y.S.2d 173, 175 (N.Y. App. Div. 1995) (emphasis in original) (finding a forum selection clause's reference to parties that "*at the request of the Assured, will submit to the jurisdiction of any Court* of competent jurisdiction" to be permissive); *Liapakis v. Sullivan,* 736 N.Y.S.2d 675, 676 (N.Y. App. Div. 2002) (finding reference to any disputes in a particular jurisdiction "to the extent practical" to be permissive); *accord Global Seafood Inc. v. Bantry Bay Mussels Ltd.,* 659 F.3d 221, 226 (2d Cir. 2011) (finding the phrase "is governed by Irish Law and the Irish Courts' to be permissive because while it confers power and authority to hear disputes, it does not "do so to the exclusion of other courts where jurisdiction may also lie).

On the other hand, a mandatory forum selection clause is prima facie valid. *Fear & Fear, Inc.,* 851 N.Y.S.2d at 312. When the parties have contractually agreed to exclusive jurisdiction in a particular forum, New York courts enforce these provisions. *See Bremen,* 407 U.S. at 92 (mandatory forum selection clause providing any dispute between the parties "must be treated before the London Court of Justice"); *Fear & Fear, Inc.,* 851 N.Y.S.2d at 312–13; *Bernstein v. Wysoki,* 907 N.Y.S.2d 49, 54–55 (N.Y. App. Div. 2010). The use of compulsory language will render a forum selection clause mandatory. *See e.g., Trump v. Deutsche Bank Trust Co. Americas,* 887 N.Y.S.2d 121, 123 (N.Y. App. Div. 2009) (finding the phrase "and borrower hereby irrevocably submits to the jurisdiction" to indicate a mandatory forum selection clause); *Boss,* 6 N.Y.3d at 246 (finding "you agree to the jurisdiction of ... for determining any controversy in connection with this Agreement" to be mandatory); *accord S & L Birchwood, LLC v. LFC Capital,*

Elorac, Inc. v. Sanofi–Aventis Canada Inc., Not Reported in Fed. Supp. (2014)

2014 WL 7261279

*Inc.,* 752 F.Supp.2d 280, 285 (E.D.N.Y. 2010) (finding "irrevocably submits" to indicate that the recited state and federal courts "would be the venue of determination of any dispute that might arise"); *AVC Nederland B.V.,* 740 F.2d at 155 (mandatory forum selection clause stated "[a]ll and any disputes, differences or questions arising from the present Agreement shall be decided and determined by the competent court at Utrecht").

**\*13** In this case, the forum selection clause indicates that "the party having sent the notice *shall be entitled* to seek redress from the Courts of the State of New York." (*See* R.1–1, § 15.3.) Although the plain meaning of "shall" can indicate the mandatory nature of a clause, in this case the "shall" does not connect to the forum directly or the use of the forum. Instead, "shall" refers to being "entitled to seek redress" from a specific forum. Being "entitled" to something indicates providing a right or benefit to something, but does not indicate that that action is mandatory. *See* BLACK'S LAW DICTIONARY 553 (7th ed. 1999) (defining "entitle" as "To grant a legal right to or qualify for"); *see also Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 477, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) (explaining that "[b]oth in the legal and general usage, the normal meaning of entitlement includes a right or benefit for which a person qualifies ..."). There are no additional words beyond "shall be entitled" in the License Agreement's forum selection clause or neighboring Disputes provision that would otherwise mandate the selection of the Courts of the State of New York as the forum. *See PCM Recovery Grp., Inc. v. Pierce,* 990 N.Y.S.2d 439, 43 Misc.3d 1212(A), at *4 (N.Y.Sup.Ct. Dec. 6, 2013) (finding "shall be governed and interpreted under the laws of [Mississippi] with jurisdiction and venue in Forrest County, Mississippi" to be mandatory as to applicability of Mississippi law and permissive as to the choice of forum); *Global Seafood,* 659 F.3d at 225 (finding "shall" without "specific language of exclusion" to be permissive). Instead, the clause simply gives the party the right to seek the New York courts as a forum. It does not mandate or guaranty it. The language of the forum selection clause empowers the New York courts to adjudicate matters relating to the License Agreement, it "declares nothing more than that [the parties'] consent to the venue and jurisdiction of a court which might otherwise not exist." *See Heyco, Inc. v. Heyman,* 636 F.Supp. 1545, 1548 (S.D.N.Y. 1986) (finding permissive a forum selection clause indicating the parties will "submit to the personal jurisdiction of the court of original jurisdiction of the State of New Jersey for resolution of all disputes arising under this Agreement"). As such, the Court finds the forum selection clause of the License Agreement to be permissive.

**B. Venue is Proper in the Northern District of Illinois**
Elorac alleges that venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) "as a substantial part of the events giving rise to the claims occurred in this District; the license agreement was negotiated and entered into by Winston in this District; and Winston and Elorac have performed their obligations under the license agreement in this District. (*See* R.1, ¶ 8.) For venue to be proper under § 1391(b)(2), a majority of the events giving rise to the claim need not occur in the venue, only a "substantial" part. *See Promero, Inc. v. Mammen,* No. 02 C 1191, 2002 WL 31455970, at *7 (N.D.Ill. Nov. 1, 2002). "If the selected district's contacts are 'substantial,' it should make no difference that another's are more so, or the most so." *Chemical Waste Mgmt. v. Sims,* 870 F.Supp. 870, 875 (N.D.Ill. 1994). In contract cases, courts have held that contemplated contractual performance and payment or non-payment of money are significant events providing a basis for venue in the district. *See Moran Ind., Inc. v. Higdon,* No. 07 C 6092, 2008 WL 4874114, at *5 (N.D. Ill. June 26, 2008) (citations omitted) (considering where performance under the contract was to take place in determining venue under § 1391(b)(2)) and *PKWare, Inc. v. Meade,* 79 F.Supp.2d 1007, 1016 (E.D.Wis. 2000) (finding venue proper where defendants were obliged under the agreement to deliver copies of software, make royalty payments and send sales report to plaintiff in the district and allegedly failed to do so). The License Agreement contemplated Winston's performance in Illinois and Sanofi Canada allegedly failed to make full payments to Winston in this District. The Court, therefore, finds that a substantial part of the events giving rise to the claims occurred in this District. Accordingly, venue properly lies in this District.

**C. Defendants Failed to Meet Their Burden to Warrant Transfer Pursuant to Section 1404(a)**
Because the Court finds the forum selection clause permissive, the Court will, pursuant to New York law, not enforce the clause against Elorac's selection of an otherwise proper venue. *See Fear & Fear, Inc.,* 851 N.Y.S.2d at 313 (explaining that a permissive forum selection clause "will generally not be enforced without some further language indicating the parties' intent to make jurisdiction exclusive.") This is especially true in this case, where once Plaintiff has established proper venue (which it has), Defendant has the burden, as the party seeking dismissal or transfer of this case, of establishing the factors considered by the Court in the § 1404(a) analysis, which includes whether venue in the transferor district is proper. *See DeGuzman v. Kalish,*

Elorac, Inc. v. Sanofi–Aventis Canada Inc., Not Reported in Fed. Supp. (2014)

2014 WL 7261279

No. 10 C 8066, 2011 WL 1378928, at * 3 (N.D. Ill. April 12, 2011) (explaining that the moving party has the burden of establishing the factors under the 1404 analysis, including whether venue is proper in the transferor district); *Ace Hardware Int'l Holdings, Ltd. v. Masso Expo Corp.,* No. 11–cv–3928, 2011 WL 5077686, at *5 (N.D.Ill. Oct. 25, 2011). Sanofi Canada did not provide analysis for the Court as to why transfer pursuant to section 1404(a) would be appropriate in this case, given the permissive forum selection clause. Accordingly, the Court denies Sanofi Canada's motion to dismiss pursuant to Rule 12(b)(3).

**CONCLUSION**

**\*14** For the reasons stated above, the Court denies Sanofi Canada's motion to dismiss.

**All Citations**

Not Reported in Fed. Supp., 2014 WL 7261279

---

**Footnotes**

1      The facts presented in the Background are taken from the complaint and are presumed true for the purpose of resolving the pending motion. *See Dixon v. Page,* 291 F.3d 485, 486 (7th Cir. 2002). The Court also considers the declarations outside of the pleadings submitted by both parties (*see e.g.,* Sanofi Canada's Declarations (R.22–1, Megyery Declaration; R.22–2, To–Dong Sec Declaration; R.27–1, Dahl Declaration) and Elorac's Declaration (R.25–1, Bernstein Declaration)). *See Felland v. Clifton,* 682 F.3d 665, 672 (7th Cir. 2012).

2      Dr. Bernstein is also founder and Executive Chairman of Elorac. (R.1, ¶ 6.)

3      Although Winston is not a party to this action and assigned its rights under the License Agreement to Elorac (*see* R.1, ¶ 68), it is relevant for the Court to consider Sanofi Canada's pre-assignment contacts with Illinois because "in breach of contract cases, the focus is on Defendants' contacts with the forum which relate[s] to the contract itself." *Ace Hardware Int'l Holdings, Ltd. v. Masso Expo Corp.,* No. 11–cv–3928, 2011 WL 5077686, at *8 (N.D.Ill. Oct. 25, 2011) (citations omitted); *see cf. Perry v. Global Auto Recycling, Inc.,* 227 F.3d 950, 953 (7th Cir. 2000) (explaining that an assignee is entitled to assume all rights that the assignor possessed against defendants under the agreements in dispute).

4      Because the Court finds it has specific jurisdiction over Sanofi Canada, Elorac's request for additional discovery is denied as moot as it was made "to the extent the Court does not exercise specific jurisdiction." (R.25, at 1, n.1.)

---

      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5904527
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.

IMPERIAL CRANE SERVICES, INC., Plaintiff,
v.
CLOVERDALE EQUIPMENT COMPANY, Defend-
ant.

Case No.: 13 C 04750
|
November 4, 2013

**Attorneys and Law Firms**

Ryan A. Hiss, Lyman & Nielsen, LLC, Oak Brook, IL, for
Plaintiff.

Howard William Burdett, Jr., Boyle Burdett, Grosse Pointe
Park, MI, John C. Gekas, Arnstein & Lehr, LLP, Chicago,
IL, for Defendant.

*OPINION AND ORDER*

Joan H. Lefkow, U.S. District Judge

**\*1** Plaintiff Imperial Crane Services, Inc. ("Imperial") filed
a one-count complaint against defendant Cloverdale
Equipment Company ("Cloverdale") alleging breach of
warranty in connection with two cranes Cloverdale sold to
Imperial. Cloverdale has moved to dismiss the complaint
pursuant to Federal Rule of Civil Procedure 12(b)(3) and
28 U.S.C. § 1391, or, in the alternative, to transfer this ac-
tion to the United States District Court for the Eastern Dis-
trict of Michigan pursuant to 28 U.S.C. § 1404. For the fol-
lowing reasons, Cloverdale's motion is denied.[1]

**BACKGROUND**[2]

Imperial is an Illinois corporation that supplies cranes and
other equipment and machinery, together with operators
for the cranes, equipment and machinery. Cloverdale is a
Michigan corporation that sells and rents cranes and related

equipment and machinery.

In March 2013, Imperial sought cranes to rent or purchase
that it would then rent out to a customer for a construction
project in Cartagena, Colombia. Imperial learned that Clo-
verdale had two 15–ton capacity carry deck cranes that
would do the job. Imperial and Cloverdale thus entered into
negotiations for the purchase of the two cranes. These ne-
gotiations took place entirely over the phone, and were be-
tween Imperial's vice president, Bill Tierney, and Clo-
verdale's president, Todd Moilanen, from their respective
offices in Illinois and Michigan. The cranes themselves
were located in Texas during the negotiations.[3]

**\*2** Over the course of the negotiations, Moilanen con-
firmed for Tierney that the two cranes Imperial sought to
purchase were ready to be shipped from Texas to Colombia
and immediately put to use. The parties settled on a price
of $107,500 per crane ($215,000 total), which Imperial was
to pay immediately via wire transfer from its bank account
in Cook County, Illinois, to Cloverdale's bank account in
Ohio.[4] One of the terms of the parties' agreement, which
was oral and never memorialized in writing, was that Im-
perial would take possession of the cranes immediately in
Port Houston, Texas, and that Cloverdale would send Im-
perial the Manufacturer's Statements of Origin for the
cranes as soon as possible.

Based on Moilanen's representations regarding the readi-
ness of the cranes for the Colombia project, Imperial ac-
cepted and paid for the cranes. After doing so, but before
the cranes were operated or used in the project, numerous
defects in the cranes were found requiring immediate repair
before the cranes could be used. The defects included en-
gine leaks, swing gearbox operation issues, damaged swing
bearing and boom wear pads, insecure counterweights, tel-
escope cylinder leaks, boom lift cylinder leaks, steer cylin-
der leaks, and hydraulic tank leaks. The estimated cost of
repairing the cranes was at least $31,109.72.

When it learned of the repairs necessary to render the
cranes usable, Imperial notified Cloverdale that it was re-
voking its acceptance of the cranes and demanded a full
refund of $215,000 in exchange for return of the cranes.
Cloverdale refused to refund to Imperial or take possession
of the cranes and has also refused to make or pay for the
repairs on the cranes. Imperial is currently incurring costs
related to the transportation and storage of the cranes.

Cloverdale has moved to dismiss the complaint for im-
proper venue pursuant to Federal Rule of Civil Procedure
12(b)(3) and 28 U.S.C. § 1391. In the alternative, it has re-

Elorac, Inc. v. Sanofi–Aventis Canada Inc., Not Reported in Fed. Supp. (2014)

2014 WL 7261279

quested that the court transfer the action to the Eastern District of Michigan, where it has a declaratory action pending regarding the same set of facts.[5]

## ANALYSIS

### I. Federal Rule of Civil Procedure 12(b)(3) Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(3) allows a party to move to dismiss an action that is filed in an improper venue. *See* Fed.R.Civ.P. 12(b)(3); *Caballero* v. *Taylor,* No. 12 C 8645, 2013 WL 2898254, at *1 (N.D. Ill. June 13, 2013). When a defendant challenges venue, the plaintiff bears the burden of establishing venue is proper. *Nat'l Tech., Inc.* v. *Repcentric Solutions,* No. 13 C 1819, 2013 WL 3755052, at *5 (N.D.Ill. July 16, 2013) (citing *Int'l Travelers Cheque Co.* v. *BankAmerica Corp.,* 660 F.2d 215, 222 (7th Cir.1981)). If venue is improper, the court can either dismiss the suit or transfer it to a district in which the plaintiff could have filed it initially. *See* 28 U.S.C. § 1406(a).

*3 The proper bases for venue are found in 28 U.S.C. § 1391(b). Under that statute venue is proper in

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). As it relates to subpart (1), an entity "with the capacity to sue and be sued in its common name under applicable law" is "deemed to reside" in any "judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." *Id.* at § 1391(c)(2).

Venue can be proper in more than one district. "The test is not whether a majority of the activities pertaining to the case were performed in a particular district but whether a substantial portion of the activities giving rise to the claim

occurred in the particular district." *TruServ Corp.* v. *Neff,* 6 F.Supp.2d 790, 792 (N.D.Ill.1998). To determine proper venue in a breach of contract action, courts take a number of factors into consideration, including "where the conduct underlying the breach occurred and where performance under the contract was to take place," *Moran Indus.* v. *Higdon,* No. 07 C 6092, 2008 WL 4874114, at *5 (N.D. Ill. June 26, 2008) (quoting *PKWare, Inc.* v. *Meade,* 79 F.Supp.2d 1007, 1016 (E.D.Wisc.2000)), and whether there was "[f]ailure to make payment in a district pursuant to a contract." *D'Ancona & Pflaum LLC* v. *M2 Software, Inc.,* No. 00 C 7150, 2001 WL 873021, at *1 (N.D.Ill. Aug. 2, 2001); *see also H & V Silver Mine, Inc.* v. *Cohen,* No. 96 C 3550, 1997 WL 639229, at *4 (N.D. Ill. Oct. 6, 1997). Additionally, "[w]here the underlying events are essentially communications made by two parties located in separate districts, '[t]he requirements of [§ 1391(b)(2) ] may be satisfied by a communication transmitted to or from the district in which the cause of action was filed, given a sufficient relationship between the communication and the cause of action.' " *Citadel Grp. Ltd.* v. *Wash. Reg'l Med. Ctr.,* No. 07 C 1394, 2008 WL 5423553, at *3 (N.D.Ill.Dec. 29, 2008) (quoting *Interlease,* 262 F.Supp.2d at 913).

In *Citadel,* for example, the court denied the defendant's motion to dismiss for improper venue where the parties had negotiated the contract from their respective offices in Illinois and Arkansas. *Citadel,* 2008 WL 5423553, at *3. The defendant argued that venue was improper in this district because all the substantial events took place in Arkansas and the parties' contract was for the construction of a building in Arkansas. The court rejected this argument as "oversimplif[ying]" the parties' relationship." *Id.* Instead, it found that substantial events occurred in both states: the defendant sent a request for proposals to the plaintiff in Illinois; the plaintiff sent its proposal to the defendant in Arkansas; the parties communicated about the proposal from their respective offices; the defendant sent the plaintiff a signed authorization with a deposit; and the plaintiff began acting pursuant to that authorization. These communications constituted substantial events and were sufficient to support venue in this district. *Id.*

*4 Similarly, in *Walron Films, Ltd.* v. *Cinequanon Pictures International,* No. 97 C 3280, 1997 WL 779059, at *2 (N.D.Ill.Dec. 12, 1997), the court denied a motion to dismiss for improper venue because "venue is proper in this district even though venue may also be proper elsewhere." The plaintiff was a Delaware corporation with its principal place of business in Chicago. It was the parent of a California corporation that entered into a film distribution agreement with the defendant, another California corporation. The agreement was executed in California and provided that the defendant would direct payments from the film to

Elorac, Inc. v. Sanofi–Aventis Canada Inc., Not Reported in Fed. Supp. (2014)

2014 WL 7261279

a Chicago bank account. After the plaintiff brought suit, the defendant moved to dismiss under Rule 12(b)(3). It argued that proper venue was California "because two California corporations signed the Agreement in California." *Id.* The court disagreed, explaining it "is axiomatic that § 1391 does not contemplate a single appropriate district for venue." *Id.* The court held that venue was proper in this district as Illinois had "substantial" contacts with the events that gave rise to the suit (the defendant's failure to send payments to the Chicago bank).

Imperial argues that a substantial part of the events took place in this district. Namely, Imperial's vice president, Tierney, negotiated the sale of the cranes by telephone, email, and facsimile from his office in Illinois with Cloverdale's president, Moilanen. (Dkt. 11 Tierney Aff. at ¶ 18.) The alleged breach itself occurred because of the material representations or omissions that Moilanen made to Tierney while Tierney was at his own office in Illinois. (Dkt. 1 at ¶¶ 18–21, 50, 54–55.)

Relying on facts underlying the ill-fated lease of the eight cranes, and not Imperial's ultimate purchase of the two cranes, Cloverdale argues venue here is improper because a substantial part of the events giving rise to this suit "did not occur in Illinois–nearly the entire transaction was negotiated and performed in Michigan." (Dkt. 6 at 5.) Specifically, Moilanen attests that Imperial's representatives traveled to Michigan and inspected the eight cranes there and that the parties reached the lease agreement in Michigan. (Dkt. 6 Moilanen Aff. at ¶¶ 11–12.) But the agreement on which this action is based is not the agreement for the lease of eight cranes, it is the agreement for the sale of two cranes. While Imperial's alleged inspection in connection with the lease may eventually be at issue in this dispute,[6] it is incorrect for Cloverdale to assert that this inspection and acceptance of the cranes are "the *only* issue[s] in this case." (Dkt. 12 at 3 (emphasis in original).)

It is true that Moilanen negotiated the contract from his office in Michigan, but the same can be said of Tierney in Illinois. These negotiations and the alleged warranty that accompanied the sale of the two cranes are the substantial events at issue. Thus, "[a]lthough venue might be proper in [Michigan], § 1391(b)(2) does not require the court to determine the best venue for an action, but merely whether 'a substantial part of the events or omissions giving rise to the claim occurred' in the judicial district in which the action was brought." *Nat'l Tech.,* 2013 WL 3755052, at *6 (quoting 28 U.S.C. § 1391(b)(2)). Substantial events surrounding the purchase of the cranes occurred in Illinois, making venue in this district proper. Thus, the Rule 12(b)(3) motion to dismiss is denied.[7]

## II. Motion to Transfer Pursuant to 28 U.S.C. § 1404

**\*5** In the alternative, Cloverdale moves to transfer this action to the Eastern District of Michigan pursuant to 28 U.S.C. § 1404(a), under which the court may transfer venue to another district for "the convenience of parties and witnesses, in the interest of justice." To support a motion to transfer venue, "the moving party must show that (1) venue is proper in this district; (2) venue is proper in the transferee district; (3) the transferee district is more convenient for both the parties and witnesses; and (4) transfer would serve the interest of justice." *See Gueorguiev v. Max Rave, LLC,* 526 F.Supp.2d 853, 856 (N.D.Ill.2007). The consideration the court gives each factor rests in the court's discretion, and the burden is on the moving party to demonstrate the transferee forum is more convenient. *See id.* at 856–57; *Citadel,* 2008 WL 5423553, at *3.

As the court has already determined venue is proper in this district, the first factor has been met. Venue would be proper in the Eastern District of Michigan because it is a district in which the defendant resides. *See* 28 U.S.C. § 1391(b)(1); *Citadel,* 2008 WL 5423553, at *4. The court thus turns to the convenience and interests of justice factors.

### A. Convenience of the Parties and Witnesses

The court considers multiple factors in deciding whether it would be more convenient to transfer the litigation. These factors include (1) the plaintiff's choice of forum; (2) the situs of material events; (3) the relative ease of access to sources of proof; (4) the convenience of the witnesses; and (5) the convenience of the parties in litigating in the respective fora. *See, e.g., Brandon Apparel Grp., Inc. v. Quitman Mfg. Co.,* 42 F.Supp.2d 821, 833 (N.D.Ill.1999).

### i. Imperial's Choice of Forum and Situs of Material Events

Under § 1404(a), a plaintiff's choice of forum is generally entitled to substantial deference, particularly if it is the plaintiff's home forum. *Nat'l Tech.,* 2013 WL 3755052, at *7. This deference is "lessened where a plaintiff chooses a forum that has little connection with the relevant facts giving rise to the litigation." *See Caballero,* 2013 WL 2898254, at *3.

Elorac, Inc. v. Sanofi–Aventis Canada Inc., Not Reported in Fed. Supp. (2014)

2014 WL 7261279

Where, as here, "the case involves two identical suits in distinct venues, this factor loses its significance entirely: each case has a plaintiff, and one of them will necessarily be disturbed." *Research Automation, Inc. v. Schrader–Bridgeport Int'l, Inc.,* 626 F.3d 973, 979 (7th Cir.2010). But where one case is a declaratory judgment action and the other is a mirror-image action that seeks coercive relief, priority is generally given to the coercive action. *Id.* at 980. This is so even if the coercive action was filed after the declaratory judgment action because the first-to-file rule is not adhered to rigidly in the Seventh Circuit. Instead, filing order is only "one factor among many" that the court may consider. *See id.* at 977. The Seventh Circuit has also explained that it is appropriate to depart from the first-to-file rule "where one party files its lawsuit in anticipation of an impending suit by the opposing party" because this "behavior only exacerbates the risk of wasteful litigation." *Id.* at 980.

Cloverdale argues that this dispute is better adjudicated in the Eastern District of Michigan because there is a "mirror image" declaratory judgment action already pending there. (Dkt. 6 at 10.) Moilanen states that after he learned Imperial planned to file suit against Cloverdale in Illinois, Cloverdale filed an action in Michigan, six days before Imperial filed this suit. (*See* Dkt. 6 Moilanen Aff. at ¶¶ 31–32; Dkt. 11 Ex. 2; Dkt. 1.)

Although the Michigan action was filed first, the complaint in that action asserts a single claim for declaratory relief that mirrors this suit, which seeks coercive relief. (*See* Dkt. 11 Ex. 2.) "Thus, regardless of [Cloverdale's] filing of an action for declaratory judgment in the [Eastern District of Michigan], [Imperial] is the plaintiff in this suit and its choice of forum will be afforded deference." *Robinson Steel Co. v. Caterpillar Inc.,* No. 10 C 438, 2011 WL 923415, at *6 (N.D.Ind. Mar. 14, 2011); *see also Bank of Am., N.A. v. Illumination Station,* No. 10 C 3061, 2011 WL 1642526, at *3 (N.D.Ill. May 2, 2011). Moreover, and as discussed above, Imperial's choice of its home forum is entitled to weight because this district is connected to the facts giving rise to this dispute. *See, e.g., Caballero,* 2013 WL 2898254, at *3. This factor thus weighs against transfer.

### ii. Situs of Material Events

**\*6** Where the situs of material events is not concentrated in one district or another, this factor is "neutral." *See Caballero,* 2013 WL 2898254, at *3. As discussed above, material events occurred in both this district and the Eastern District of Michigan. This factor is thus a draw.

### iii. Convenience of the Parties

In evaluating this factor the court will consider "the parties' respective residences and their ability to bear the expenses of litigating in a particular forum." *Genocide Victims of Krajina v. L–3 Servs., Inc.,* 804 F.Supp.2d 814, 826 (N.D.Ill.2011). Cloverdale argues that the convenience of the parties favors Michigan because its witnesses and evidence are in Michigan and Imperial has shown itself able to travel to Michigan. (Dkt. 6 at 9.) Predictably, Imperial argues the opposite. (Dkt. 11 at 11.) Neither party argues that it would be unable to meaningfully present its case in the other's home forum. "Litigation in another district is inevitably inconvenient for a party," and the court therefore finds this factor does not favor either venue. *Nat'l Tech.,* 2013 WL 3755052, at *7.

### iv. Relative Ease of Access to Sources of Proof

Cloverdale argues this factor "slightly favors Michigan" because all documents relating to Imperial's inspection of the cranes in Michigan (in connection with the lease of the eight cranes) and all other relevant documents in Cloverdale's possession are located in Michigan. (Dkt. 6 at 8.) Imperial argues that its documents are in Illinois. It also points out that the cranes are currently located in Illinois (although Cloverdale protests that the cranes' current condition is "immaterial; that Imperial let the cranes deteriorate after it took possession of the cranes months ago is of no import to the outcome of this litigation" (dkt. 12 at 2)).

This factor does not strongly favor either venue because "documents and records are easily transportable (and, indeed, must be copied and delivered to the opponent no matter where the case will be litigated) and their location generally is not a persuasive reason for transfer." *Simonoff v. Kaplan, Inc.,* No 09 C 5017, 2010 WL 1195855, at *2 (N.D.Ill. Mar. 17, 2010). To the extent the current condition of the cranes will be relevant, the court finds it would not be too burdensome for Cloverdale representatives to travel to Illinois to inspect the cranes.

### v. Convenience of Witnesses

"The determination of the convenience of witnesses is of-

Elorac, Inc. v. Sanofi–Aventis Canada Inc., Not Reported in Fed. Supp. (2014)

2014 WL 7261279

ten considered the most important factor in the transfer balance." *Addiction & Detoxification Inst., LLC v. Rapid Drug Detox Ctr.,* No. 11 C 7992, 2013 WL 951115, at *4 (N.D.Ill. Mar. 11, 2013). The convenience of non-party witnesses is "substantially more important than the convenience of party witnesses" because party witnesses can easily "compel their employees' appearances at trial." *Id.*

Cloverdale's president, Moilanen, has sworn in his affidavit that in addition to relying on his own testimony and the testimony of various Cloverdale employees who reside in Michigan, he plans to call a third party witness, Patrick Henry. (Dkt. 6 Moilanen Aff. at ¶¶ 26–27.) Henry is employed by a non-party and was present for Imperial's inspection of the eight cranes in Cloverdale's yard in Michigan. (*Id.* at ¶ 27.) Moilanen states that Henry will "provide independent, third-party testimony regarding the inspection and negotiations regarding Imperial's initial rental of the eight cranes," testimony that Moilanen believes is "critical for [Cloverdale's] defense." (*Id.* at ¶¶ 27, 29.) Cloverdale argues Henry would not be subject to compulsory process in this court but would be subject to such process in the Eastern District of Michigan.

*7 Imperial argues that Henry's testimony is not relevant because it relates to the lease of the eight cranes, which is not at issue in this suit. (Dkt. 11 at 12.) Imperial's vice president, Tierney, states that the testimony of its third party witness, Tony Blanzeniak (a resident of Illinois), is critical to Imperial's claim for damages and that Blanzeniak is not subject to subpoena power in Michigan. (Dkt. 11 at Tierney Aff. at ¶ 3 3.) According to Tierney, Blanzeniak will testify to the condition of the two cranes Imperial purchased. (*Id.*) Cloverdale rebuts that Blanzeniak's testimony is inconsequential because "[t]he current condition of the cranes is immaterial." (Dkt. 12 at 2.) Tierney also identifies another non-party witness, James Langley, who is a resident of Texas. (Dkt. 11 at Tierney Aff. at ¶ 33.) Tierney asserts that Langley will testify to the condition of the two cranes and their inspection that was performed in Texas after Imperial purchased them. (*Id.*)

This factor does not weigh heavily in favor of either forum. Both parties argue they will rely on a third party witness who cannot be subpoenaed in the other's preferred district, and both parties argue that the other's third party witness is irrelevant to this litigation. A third non-party witness does not reside in either party's favored forum. Because the court finds that the "balance of convenience is a close call, merely shifting inconvenience from one party to another is not a sufficient basis for transfer." *Research Automation,* 626 F.3d at 978.

### B. Interests of Justice

In considering the interests of justice, the court looks to factors such as docketing congestion and speed to trial in the transferor and potential transferee districts; each court's relevant familiarity with the applicable law; the desirability of resolving the controversy in each forum; and the relationship of the respective communities to the controversy. *See id.* "The interest of justice may be determinative, warranting transfer or its denial even where the convenience of the parties and witnesses points toward the opposite result." *Id.*

As Cloverdale acknowledges, there is no substantial difference in the median time to trial or resolution of cases in this district versus the Eastern District of Michigan.[8] This factor is thus not determinative. Nor is the law to be applied. Imperial argues, and Cloverdale does not refute, that the law to be applied is the Uniform Commercial Code, law that does not differ much from state to state and that any federal court can apply with ease. "Furthermore, the court finds no reason why [Michigan] would have a greater interest in contract and [warranty] claims against a [Michigan] company than Illinois would have in resolving such claims brought by an Illinois resident corporation." *Nat'l Tech.,* 2013 WL 3755052, at *8

Moreover, the court finds the cases on which Cloverdale relies to be distinguishable. In *United States ex rel. Heathcote Holdings Corp. v. L'Oreal USA, Inc.,* No. 11 C 1921, 2011 WL 3511064, *4 (N.D.Ill. Aug. 9, 2011), the interests of justice favored transfer to the Southern District of New York because the material events in that case took place in the New York metropolitan area, and the litigation hinged on decisions made by the defendant in New York. *Heathcote* did not involve a contract negotiated in two different venues, as is the case here. There were also other similar suits pending against the defendant in the Southern District of New York in *Heathcote.*

Cloverdale also relies on *Sanders v. Franklin,* 25 F.Supp.2d 855, 859 (N.D.Ill.1998), in which the court held that the interests of justice favored resolution of the dispute in Michigan as opposed to this district because "Michigan's law governs the alleged contract[,] ... this is an action between current and former Michigan residents[, and] ... Michigan has a greater interest in adjudicating over matters involving business transactions occurring within its jurisdiction." As already addressed, this suit is between an Illinois resident and a Michigan resident, and substantial events giving rise to it occurred in this district.

*8 Finally, as discussed above, the court is not persuaded that the interests of justice favor the Eastern District of Michigan by virtue of the mirror-image declaratory judgment action Cloverdale filed there. The court thus finds that

**Elorac, Inc. v. Sanofi–Aventis Canada Inc., Not Reported in Fed. Supp. (2014)**

2014 WL 7261279

the interests of justice do not weigh in favor of transferring the case to the Eastern District of Michigan. In light of all the aforementioned factors, the court holds that this case would be best served by remaining in this district.

**CONCLUSION AND ORDER**

For the foregoing reasons, Cloverdale's motion to dismiss pursuant to Rule 12(b)(3), or, in the alternative, to transfer

venue pursuant to 28 U.S.C. § 1404 (dkt.5) is denied. Imperial shall move to stay the Michigan action. Defendant is directed to answer the complaint. This case is set for a scheduling conference on November 21, 2013 at 8:30 a.m. The parties shall report on the status of the Michigan case and present a proposed scheduling order.

**All Citations**

Not Reported in Fed. Supp., 2013 WL 5904527

---

**Footnotes**

1    This court has jurisdiction pursuant to 📁 28 U.S.C. § 1332. Imperial is an Illinois corporation with its principal place of business in Bridgeview, Illinois. (Compl. at ¶ 1.) Cloverdale is a Michigan corporation with its principal place of business in Oak Park, Michigan. (*Id.* at ¶ 2.) More than $75,000 is in controversy. (*Id.* at ¶ 4.)

2    The following facts are taken from the complaint and presumed true unless contradicted by affidavit. *See Interlease Aviation Investors II (Aloha) L.L.C. v. Vanguard Airlines, Inc.,* 262 F.Supp.2d 898, 913 (N.D.Ill.2003). In ruling on a Rule 12(b)(3) motion, the court is not obligated to limit its consideration to the pleadings. *See Cont'l Cas. Co. v. Am. Nat'l Ins. Co.,* 417 F.3d 727, 733 (7th Cir.2005).

3    In support of its motion to dismiss or transfer venue, Cloverdale provides the affidavit of its president, Todd Moilanen. Moilanen asserts therein that the purchase of the two cranes stemmed from a failed leasing transaction. Specifically, he states that Imperial initially contacted Cloverdale in February (not March) 2013 in connection with the Colombia project, and that the parties discussed Cloverdale's leasing eight cranes to Imperial. (Dkt. 6 at Moilanen Aff. ¶¶ 6–9.) Later, two Imperial representatives traveled to Michigan to inspect the eight cranes. (*Id.* at ¶ 9.) The parties reached their lease agreement in Michigan and Imperial sent trucks to Cloverdale's yard in Michigan to transport the cranes to Texas. (*Id.* at ¶¶ 12–13.) Once the cranes were in Texas, however, all but two cranes were returned to Cloverdale. (*Id.* at ¶ 16.) It was then—with the two cranes still in Texas—that the parties negotiated the terms for the actual sale of those two cranes that are the subject of this suit. (*Id.* at ¶¶ 17–18.)

     Imperial does not contest this version of the facts, and the court accepts these facts as true. *See Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.,* No. 07 C 1394, 2008 WL 5423553, at *2 (N.D.Ill.Dec. 29, 2008) (in ruling on 12(b)(3) motion, "we must take all the allegations in the plaintiff's complaint as true unless they are contradicted by affidavit") (citing *Interlease,* 262 F.Supp.2d at 913). Imperial contends, however, that the failed lease of the eight cranes and its ultimate purchase of the two cranes were separate transactions, and the transaction at issue here is the purchase. (Dkt. 11 at 1–2.) As discussed in text, the court finds that the agreement that gave rise to this dispute and the agreement whose terms will be at issue in this litigation is the agreement for Imperial's purchase of the two cranes, not the eight-crane lease agreement.

4    Moilanen does not state the location of Cloverdale's bank in his affidavit, but Cloverdale's brief in support of its motion to dismiss asserts that its bank is located in Michigan, not Ohio. (Dkt. 6 at 6.) Imperial's allegation that Cloverdale's bank is located in Ohio is supported by its affidavit and this dispute must be resolved in favor of Imperial. *See Nat'l*

*Tech., Inc. v. Repcentric Solutions,* No. 13 C 1819, 2013 WL 3755052, at *5 (N.D.Ill. July 16, 2013) (in ruling on a 12(b)(3) motion, "[f]actual conflicts are resolved in favor of the plaintiff, and the court may draw reasonable inferences from those facts") (citing *Moore v. AT & T Latin Am. Corp.,* 177 F.Supp.2d 785, 788 (N.D.Ill.2001)).

5 According to Moilanen, once Imperial threatened to bring suit against Cloverdale in the Circuit Court of Cook County, Moilanen instructed his attorneys to file a declaratory action in Michigan. (Dkt. 6 Moilanen Aff. at ¶¶ 31–32.) Cloverdale initially filed suit in the State Court of Michigan, Oakland County, on June 25, 2013, and Imperial removed the suit to federal court based on diversity of citizenship. (Dkt. 11 Ex. 3 at 3–4.) That suit is still pending in the Eastern District of Michigan. (Dkt. 6 at 3.)

6 Moilanen's affidavit indicates that the two cranes Imperial purchased were among the eight it inspected in connection with the lease. (Dkt. 6 Moilanen Aff. at ¶¶ 9, 11–17.)

7 Imperial argues that venue is also proper pursuant to § 1391(b)(1) because, as an entity subject to personal jurisdiction in this district, Cloverdale is a "resident" of this district for purposes of venue. As noted above, venue is proper in any district in which a defendant corporation is subject to the court's personal jurisdiction. 28 U.S.C. § 1391(c)(2). Cloverdale has not contested this court's personal jurisdiction. By filing the present motion without previously or contemporaneously filing a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, Cloverdale has waived that defense. *See* Fed.R.Civ.P. 12(h); *see also* *XPO Logistics, Inc. v. Gallatin,* No. 13 C 1163, 2013 WL 3835358, at *5 (N.D.Ill. July 24, 2013). Venue is thus also proper under § 1391(b)(1) because Cloverdale is a resident of this district.

8 Median time to trial in this district is 28.9 months versus 25.8 months in the proposed transferee district. Median time to resolution is 6.7 months in this district versus 8.3 months in the Eastern District of Michigan. (Dkt. 6 Ex. E at 3.)

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.