IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE**,**<br><br>                        Plaintiff,<br><br>      v.<br><br>STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board,<br><br>                  Defendant. | **Case Number**:  3:24-cv-50504<br><br>**Judge**:  Hon. Iain D. Johnston<br><br>**Magistrate Judge**:  Michael F. Iasparro |

**DEFENDANT STEVEN S. CLIFF'S SECOND REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS**

Pursuant to Rule 201 of the Federal Rules of Evidence, Defendant Steven S. Cliff, in his official capacity, respectfully requests that the Court take judicial notice of the following documents[1]:

1.   A public comment filed with the Illinois Pollution Control Board (Board) by the Truck and Engine Manufacturers Association (EMA) on April 28, 2025, concerning a petition that the Board adopt certain California regulations. The comment was downloaded from the following link on October 1, 2025: https://pcb.illinois.gov/documents/dsweb/Get/Document-113637/2025%2004%2028%20commens-516-%20R24-17.pdf. A true and correct copy of the comment is attached hereto as **Exhibit A**.

2.   A decision issued by the Board on September 18, 2025 concerning the same petition. The decision was downloaded from the following link on September 30, 2025: https://pcb.illinois.gov/documents/dsweb/Get/Document-114496/24-017%20order%2009182025.pdf. A true and correct copy of the decision is attached hereto as **Exhibit B**.

**Exhibits A** is a proper subject of judicial notice under Fed. R. Evid. 201. The document is publicly available on a government website, and is a public record of a state agency. *Ambrosetti v. Oregon Cath. Press*, 458 F. Supp. 3d 1013, 1016 n.1 (N.D. Ind. 2020) (collecting cases). Courts "may take judicial notice of public record information obtained from an official government website." *See Menominee Indian Tribe of Wisconsin v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998) ("Judicial notice of . . . documents contained in the public record, and reports of administrative bodies is proper.").

**Exhibit B** is a proper subject of judicial notice, as it is also publicly available on a government website, and is the decision of an administrative body. *Opoka v. INS*, 94 F.3d 392, 394 (7th Cir. 1996) (recognizing that notice can be taken of "relevant decisions of . . . administrative agencies," and taking notice of a decision of the Board of Immigration Appeals).

---

[1] Defendant Cliff requests only that the court notice the fact of these documents and the existence of the contents therein.

Dated: October 1, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General


*/s/ Jonathan A. Wiener*
JONATHAN A. WIENER (*pro hac vice*)
BENJAMIN P. LEMPERT (*pro hac vice*)
Deputy Attorneys General
 455 Golden Gate Ave, Suite 11000
 San Francisco, CA 94102
 (415) 510-3549
 jonathan.wiener@doj.ca.gov
*Attorneys for Defendant Steven S. Cliff, in his*
*official capacity as Executive Officer of the*
*California Air Resources Board*

OK2024305825
67973114.docx

# Exhibit A

Electronic Filing: Received,Clerk's Office 04/28/2025 P.C. #516

**BEFORE THE ILLINOIS POLLUTION CONTROL BOARD**

| | | |
|---|---|---|
| **IN THE MATTER OF:** | ) | |
| | ) | **R.2024-017** |
| **PROPOSED CLEAN CAR AND** | ) | |
| **TRUCK STANDARDS** | ) | **(Rulemaking – Air)** |

**COMMENTS OF THE**
**TRUCK AND ENGINE MANUFACTURERS ASSOCIATION**

April 28, 2025

Timothy A. French
Truck and Engine Manufacturers Association
333 West Wacker Drive, Suite 810
Chicago, IL 60606

**BEFORE THE ILLINOIS POLLUTION CONTROL BOARD**

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | R.2024-017 |
| PROPOSED CLEAN CAR AND | ) | |
| TRUCK STANDARDS | ) | (Rulemaking – Air) |

      The Truck and Engine Manufacturers Association (EMA) appreciates this opportunity to submit these comments on the Petitioners' request that the Illinois Pollution Control Board (IPCB) adopt in Illinois two sets of regulations that the California Air Resources Board (CARB) previously adopted and implemented in the State of California to continue the reduction of emissions from new medium-duty and heavy-duty (MHD) trucks and truck engines. The CARB regulations at issue are known as the Heavy-Duty Omnibus Low-NOx (Omnibus) regulations, which establish near-zero NOx emission standards for MHD trucks, and the Advanced Clean Trucks (ACT) regulations, which require that MHD truck manufacturers sell increasing percentages of zero-emission MHD trucks (ZEV trucks). Petitioners ask that the IPCD utilize the preemption exemption contained in section 177 of the federal Clean Air Act (CAA) to implement in Illinois regulations identical to the Omnibus and ACT programs starting in the 2029 model year (MY).

      EMA represents the MHD truck and engine manufacturers that are regulated under the ACT and Omnibus regulations. EMA participated actively in the underlying CARB rulemakings, and in a number of follow-on rulemakings pursuant to which other states have "opted-in" to the Omnibus and ACT regulations. As a result, EMA and its members have a direct and significant interest in the Petitioners' pending proposal.

      While EMA understands the Petitioners' interest in CARB's ACT and Omnibus programs, the regulatory landscape as it relates to those programs has changed dramatically. One result from that dramatic shift is that the IPCB will be preempted from enforcing the amended ACT regulations at issue, and will similarly be preempted from enforcing the Omnibus regulations once CARB substantively amends those standards later this year. Moreover, beyond being preempted under federal law, the Petitioners' proposals are simply unworkable at this time given the lack of the requisite ZEV-truck recharging infrastructure in Illinois, and given the recent federal pull-back of the requisite ZEV-truck financial incentives (including under the NEVI program) to spur on the growth of the ZEV truck market, including in Illinois. Such subsidized infrastructure buildouts and ZEV-truck purchase incentives are essential prerequisites to any cost-effective efforts to accelerate the transition to ZEV trucks. Consequently, as detailed below, the IPCD should consider deferring action on the Petitioners' proposal until such time as the core preemption and ZEV-market feasibility and readiness issues are resolved.

      As an initial matter, section 177 of the federal Clean Air Act (CAA) – the controlling statutory provision – makes it clear that states can only implement and enforce California mobile source regulations for certain model years if **"such standards are identical to the California**

**standards for which a waiver has been granted for such model years."** Here, that condition precedent cannot and will not be met, at least for the foreseeable future.

CARB has adopted two sets of substantive amendments to the ACT regulations since they were first approved in 2021. Those amendments, adopted by the CARB Board on May 23, 2024, and on November 21, 2024, make a number of necessary substantive changes to the ACT regulations, including: a 3-year deficit makeup period (subject to a 30% cap); an allowance to sell 0.05 g NOx engines in MY 2026; an allowance to use ZEVs to make up 50% of deficits; a 100% sales mandate as of 2036; new criteria for determining when and where new truck sales are made; new labeling and reporting requirements to protect OEMs and dealers from liability for unintended "leakage" of legacy engines into California (or other opt-in states); and new allowances for the purchase of ACT credits. Significantly, those multiple substantive amendments are not yet "final" under California law because California's Office of Administrative Law (OAL) has not yet approved those amendments for publication in the California Code of Regulations, although OAL is expected to do so soon.

More significant, however, is the fact that once all of the ACT amendments are final, it is our understanding that CARB does **not** intend to submit those substantive amendments to EPA for a new preemption waiver or for a determination that the amendments are within the scope of EPA's original waiver for the ACT regulations, which EPA issued on April 6, 2023. CARB is likely (and perhaps rightly) concerned that EPA, under the Trump Administration, would deny any additional waiver requests.

Of note is that the CARB Board resolution, dated October 24, 2024, adopting the full set of ACT amendments, expressly recognized that an additional EPA waiver determination is required for the substantively amended ACT regulations. More specifically, in its adopting Resolution (Resolution 24-5, p.8), the CARB Board expressly stated that "the Executive Officer **shall**, upon [final] adoption, forward the Proposed [ACT] Amendments to the Environmental Protection Agency with a request for a [preemption] waiver or confirmation that the amendments are within the scope of an existing waiver of federal preemption." But now, given the change of Administrations, CARB staff likely will **not** be following that directive. That may not be an immediate concern for CARB since, under the Clean Trucks Partnership (CTP) Agreement, OEMs have agreed to try to comply with the ACT regulations in California notwithstanding the results of any litigation involving the status of preemption waivers. But, importantly, there is no CTP agreement in place with Illinois or any other "opt-in" state.

In addition, the Petitioners have been unclear about which set of ACT amendments they want the IPCB to adopt. There should be no ambiguity on that point, however, since the IPCB is bound to adopt any and all ACT amendments to ensure that Illinois' ACT program would be fully "identical" to California's ACT program, as required under CAA section 177. On that point, the Petitioners' proposal is inconsistent with the CAA's "identicality" requirement, since they are seeking to carve out the 100% ZEV-sales mandate that takes effect in MY 2036 under CARB's amended ACT regulations. Such state-specific carve-outs from CARB regulations are not permitted under CAA section 177.

Electronic Filing: Received,Clerk's Office 04/28/2025 P.C. #516

That issue aside, all of the numerous and important substantive amendments that CARB has made to the ACT regulations have created a "Catch 22" for the IPCB: the IPCB needs to adopt and implement **all** of the ACT amendments to ensure that Illinois' ACT regulations will be **identical** to California's, but, at the same time, the IPCB will be precluded from enforcing those necessary ACT amendments because, as we understand it, **CARB will not be seeking and EPA will not be granting the requisite waiver or "within the scope" determination for those necessary amendments.** Again, as noted at the outset, Illinois can only implement and enforce mobile source standards that are "identical to the California standards **for which a waiver has been granted**." Here, it appears that CARB will not be seeking or receiving that waiver determination for the amended ACT regulations notwithstanding the CARB Board's express recognition and direction to its Executive Officer that it is necessary.

The net result is that the IPCB will be precluded under CAA section 177 from implementing and enforcing in Illinois the substantive ACT amendments that are necessary to make Illinois' ACT regulations identical to California's. And, as a further result, the amended ACT regulations will no longer be exempt from federal preemption under the CAA. Significantly, all of this is further complicated by the EPA's transmittal to Congress of EPA's original ACT and Omnibus waiver determinations for review and potential invalidation under the Congressional Review Act.

The IPCB cannot ignore this fundamental obstacle to the implementation of the Petitioners' proposal. The Catch-22 at issue is not a matter of perspective or public policy; it is a matter of federal law.

There are other fundamental problems with the Petitioners' proposal as well. First, with respect to the Omnibus regulations, it makes little sense to implement those California low-NOx regulations starting in MY 2029 when CARB has agreed to align those regulations with EPA's nationwide low-NOx regulations starting two years earlier in the 2027 MY. CARB will be amending and aligning its MHD low-NOx regulations to conform with EPA's through a rulemaking slated for the fourth quarter of this year, consistent with the Clean Truck Partnership (CTP) Agreement that CARB entered into with EMA and certain of its members in June of 2023. As a consequence of that agreed-upon regulatory alignment, the proposed Omnibus opt-in is, in reality, a wasted exercise. The amended aligned Omnibus low-NOx standards will be in effect by operation of EPA's harmonized nationwide regulations starting in MY 2027, with or without any action on the Petitioners' request.

In addition, once CARB adopts its aligning Omnibus amendments later this year, the same "Catch-22" analysis that applies to the amended ACT regulations also will apply to the amended Omnibus regulations. As noted, in the fourth quarter of this year, CARB will adopt significant amendments to the Omnibus regulations in order to fulfill CARB's commitments to regulatory harmonization under the CTP. Those amendments will include, among other things: aligning with EPA's low-NOx standards starting with the 2027 model year; adopting EPA's procedures and standards for in-use testing (including corrections for cold ambient temperatures and in-use measurement accuracy); adopting numerous substantive and technical revisions to the applicable onboard diagnostic (OBD) testing requirements; and otherwise ensuring consistency between the California and nationwide low-NOx programs. The IPCB will be obligated to adopt those same amended Omnibus regulations to maintain the requisite "identicality" with CARB's Omnibus

4

Electronic Filing: Received,Clerk's Office 04/28/2025 P.C. #516

regulations, but, at the same time, will be precluded from enforcing those amendments in Illinois because, as with the ACT amendments, CARB in all likelihood will not seek or obtain a preemption waiver or "within the scope" determination from EPA for those important Omnibus amendments.

The net result again is that the IPCB will be precluded from enforcing the Omnibus regulations until such time as CARB is actually able to receive a preemption waiver or "within the scope" determination from EPA for the amended Omnibus regulations. While it is hard to assess when that might be, it seems evident that it will not occur, at the earliest, until sometime after the next Presidential election. Given that, it seems premature at best for the IPCB to pursue an opt-in rulemaking that can have no operational effect in Illinois for at least the next 5 years. The same holds true with respect to the ACT regulations as well.

Of note is that other opt-in states have recognized the many current practical impediments to implementing the ACT regulations in a feasible and cost-effective manner, given the lack of the necessary ZEV-truck recharging infrastructure and ZEV-truck purchase incentives. More specifically, Maryland has announced a two-year deferral of its ACT program and has commissioned a ZEV infrastructure needs and cost assessment to inform the State's next steps. Similarly, Massachusetts has recently implemented a two-year deferral of the ACT program as well.

In light of all the foregoing developments and issues – issues that the IPCB is bound under the law to acknowledge – there is no sufficient justification at this time for proceeding with the consideration of the Petitioners' proposal. Instead, consistent with federal law, the IPCB should defer any consideration of opting-in to the amended ACT and Omnibus regulations until such time as the underlying preemption waiver issues have been fully resolved, and the relative benefits of implanting CARB's programs in Illinois can be more fully assessed.

EMA is submitting these comments consistent with the relevant provisions of the CTP, and in furtherance of one of its core purposes, which is to promote the implementation of harmonized cost-effective nationwide standards to continue the reduction of emissions from MHD vehicles and engines. EMA looks forward to continuing to work with the IPCB toward that common goal.

Respectfully submitted,

TRUCK & ENGINE
MANUFACTURERS ASSOCIATION

Electronic Filing: Received,Clerk's Office 04/28/2025 P.C. #516

# Appendix A-1

## Proposed Regulation Order

### Proposed Amendments to the Advanced Clean Trucks Regulation and the Zero-Emission Powertrain Certification Test Procedure

[Note: The proposed modifications (referred to as 15-Day Changes) to the originally proposed regulations are shown below. This version (Appendix A-1) complies with Government Code sections 11346.2, subdivision (a)(3), and 11346.8, subdivision (c). The originally proposed regulatory text made available on March 26, 2024, for public comment for at least 45 days (from March 29, 2024, to May 13, 2024) referred to as the 45-Day Changes, is incorporated into this version as plain, clean text (shown in "normal type") because it is not being made available for public comment by this Notice. The Proposed 15-Day Changes are shown in tracked changes and are made public with this Notice and available for comment. The 15-Day Changes are being presented in multiple versions. For ease of readability, and to review these 15-Day Changes in an Accessible format, please refer to the Word (.docx) version (Appendix A-2).]

Date of release: October 7, 2024

Date of hearing: October 24, 2024

Electronic Filing: Received,Clerk's Office 04/28/2025 P.C. #516

### Proposed Regulation Order

Advanced Clean Trucks Regulation

Amend Sections 1963, 1963.2, 1963.3, 1963.4, and 1963.5 of title 13, California Code of Regulations, to read as follows:

### Section 1963.    Advanced Clean Trucks Purpose, Applicability, Definitions, and General Requirements.

(a)    *Purpose.* The purpose of sections 1963, 1963.1, 1963.2, 1963.3, 1963.4, 1963.5, and 1963.6 is to accelerate the market for on-road zero-emission vehicles and to reduce emissions of oxides of nitrogen (NOx), fine particulate matter (PM), other criteria pollutants, toxic air contaminants, and greenhouse gases (GHG) from medium- and heavy-duty on-road vehicles.

(b)    *Scope and Applicability.* Any manufacturer that certifies on-road vehicles over 8,500 lbs. gross vehicle weight rating for sale in California is subject to sections 1963, 1963.1, 1963.2, 1963.3, 1963.4, 1963.5, and 1963.6 except as specified in section 1963(e).

(c)    *Definitions.* The following definitions apply for sections 1963 through 1963.6:

"All-electric range" means the number of miles a vehicle can travel using electricity stored on-board the vehicle as tested per the requirements of 17 CCR section 95663(d) for on-road vehicles with a GVWR over 8,500 lbs.

"Battery-electric vehicle" or "BEV" has the same definition as "Electric Vehicle" in 40 Code of Federal Regulations (CFR) section 1037.801, last amended by the United States Environmental Protection Agency (U.S. EPA) on June 17, 2013, incorporated by reference herein.

"Class 2b-3" means an on-road vehicle with a GVWR that is 8,501 pounds up to 14,000 pounds.

"Class 2b-3 group" means the group of all on-road vehicles with a GVWR that is 8,501 pounds up to 14,000 pounds.

"Class 4" means an on-road vehicle with a GVWR that is 14,001 pounds up to 16,000 pounds.

2

"Class 4-8 group " means the group of all on-road vehicles with a GVWR that is 14,001 pounds and above, including "yard tractors" as defined in 1963(c), except for a "tractor" as defined in section 1963(c).

"Class 5" means an on-road vehicle with a GVWR that is 16,001 pounds up to 19,500 pounds.

"Class 6" means an on-road vehicle with a GVWR that is 19,501 pounds up to 26,000 pounds.

"Class 7" means an on-road vehicle with a GVWR that is 26,001 pounds up to 33,000 pounds.

"Class 7-8 tractor group" means a group of on-road vehicles, that have a GVWR 26,001 and above, including all vehicles that meet the definition of "tractor" as defined in section 1963(c), except "yard tractors" as defined in section 1963(c).

"Class 8" means an on-road vehicle with a GVWR that is 33,001 pounds and above.

"Complete vehicle" has the same definition as 17 CCR section 95662(b)(1).

"Excluded bus" means a vehicle that meets all the following conditions:

    (A)    A passenger-carrying vehicle with a GVWR that is 14,001 pounds or more;

    (B)    Has a load capacity of fifteen (15) or more passengers;

    (C)    Is not a cutaway vehicle as defined in 13 CCR section 2023 (b)(17); and

    (D)    Is not a school bus as defined in the California Vehicle Code section 545.

"Executive Officer" means the Executive Officer of the California Air Resources Board (CARB) or his or her authorized representative.

"Gross vehicle weight rating or "GVWR" has the same meaning as GVWR in California Vehicle Code section 350.

"Hydrogen fuel-cell electric vehicle" or "FCEV" has the same definition as 13 CCR section 1962.2.

"Incomplete vehicle" has the same definition as 17 CCR section 95662(ba)(26)(B)(2).

3

Electronic Filing: Received, Clerk's Office 04/28/2025 P.C. #516

"Manufacturer" means any person who assembles new on-road motor vehicles, or imports such vehicles for resale, or who acts for and is under the control of any such person in connection with the distribution of new motor vehicles, but shall not include any dealer with respect to new motor vehicles received in commerce. In general, this term includes any person who manufactures or assembles an on-road vehicle or other incomplete on-road vehicle for sale in California or otherwise introduces a new on-road motor vehicle into commerce in California as the manufacturer of record. A manufacturer includes importers who import on-road vehicles for resale and persons who assemble glider vehicles. A manufacturer does not include persons who supply parts to the importer or to the vehicle manufacturer of record, nor does it include the secondary vehicle manufacturer.

"Model year" means a designation meeting the definition of "model year" under 17 CCR section 95662(a)(16).

"Near-zero-emission vehicle" or "NZEV" means one of the following:

(A)     An on-road plug-in hybrid electric vehicle which has the same definition as that in 40 CFR section 86.1803-01, amended on July 1, 2011, incorporated by reference herein, that achieves all- electric range as defined in section 1963(c); or

(B)     An on-road hybrid electric vehicle that has the capability to charge the battery from an off-vehicle conductive or inductive electric source and achieves all-electric range as defined in section 1963(c).

"NZEV credit" means a credit generated by producing and selling a NZEV in California.

"Secondary vehicle manufacturer" has the same definition as 40 CFR section 1037.801, last amended by the U.S. EPA on ~~June 17, 2013~~April 22, 2024, incorporated by reference herein.

"Tractor" means an on-road vehicle meeting one of the following:

(A)     The definition of "tractor" in 17 CCR section 95662(a)(23); or

(B)     The definition of "vocational tractor" in 17 CCR section 95662(a)(27).

"Vehicle" or "on-road vehicle" means new equipment that meets the following criteria:

(A)     Has a GVWR that is 8,501 pounds and above;

4

Electronic Filing: Received, Clerk's Office 04/28/2025 P.C. #516

(B)     Is equipment intended for use on highways, and meets the definition set forth in 17 CCR section 95662(a)(26);

(C)     Is not a trailer as defined in 17 CCR section 95662(a)(24); and

(D)     Is not an excluded bus as defined in section 1963(c).

"Yard tractor" means a vehicle that was originally designed to be operated on- road and has a movable fifth wheel that can be elevated and is used in moving and spotting trailers and containers at a location or facility. Yard tractors are also commonly known as yard goats, hostlers, yard dogs, trailer spotters, or jockeys.

"Zero-emission vehicle" or "ZEV" means an on-road vehicle with a drivetrain that produces zero exhaust emission of any criteria pollutant (or precursor pollutant) or greenhouse gas under any possible operational modes or conditions.

"ZEV credit" means a credit generated by producing and selling a ZEV into California.

(d)     *General Requirements.* Except as provided in section 1963(e), a manufacturer must retire a number of ZEV or NZEV credits that equals or exceeds the total annual deficits each model year, subject to the provisions of section 1963.3.

(e)     *Low Volume Exemption.* For each model year through the end of the 2035 model year, manufacturers that do not exceed 500 average annual sales of on- road vehicles produced and delivered for sale in California for the three prior model years are exempt from the requirements of sections 1963 through 1963.5. Manufacturers that meet this exemption as of 2021 but subsequently exceed 500 average annual vehicle sales in any model year become subject to the requirements of sections 1963 through 1963.5 starting the second model year after the average annual sales exceeded the threshold.

(f)     *Voluntary Credit Generation.* Any manufacturer that is exempt may elect to generate ZEV or NZEV credits per the provisions of section 1963.2. If a manufacturer chooses to generate ZEV or NZEV credits, it must comply with the credit generation, banking, and trading provisions of section 1963.2, the reporting and recordkeeping requirements of section 1963.4, and the enforcement provisions of section 1963.5.

(g)     *Vehicle Labeling.* For all new 2025 model year or later vehicles produced and delivered for sale in California, the manufacturer must indicate the vehicle is or is not intended for sale as a new vehicle in California. If that

5

Electronic Filing: Received,Clerk's Office 04/28/2025 P.C. #516

information is included, the manufacturer shall not be subject to sections 1963.5(a)(2)(A-B). Conversely, should this information be excluded upon the sale of a new 2025 model year or later vehicle, the manufacturer shall be subject to sections 1963.5(a)(2)(A-B).

Electronic Filing: Received, Clerk's Office 04/28/2025 P.C. #516

(1)     For all vehicles produced and delivered for sale in California, manufacturers must permanently affix, engrave, or stamp an identification label with the term "for sale in CA". The label must be affixed to either the engine, ZEV powertrain, next to the powertrain's emergency disconnect or charge port, or the vehicle's driver side door jamb. Alternatively, manufacturers may include the "for sale in CA" language on the label required under 17 CCR section 95663(d).

(2)     For all vehicles produced and delivered for sale in California, manufacturers must disclose to the ultimate purchaser, secondary vehicle manufacturer, or dealer that the vehicle is intended for sale in California on the manufacturer's Statement of Origin.

NOTE: Authority cited: Sections 38501, 38510, 38560, 38566, 39500, 39600, 39601, 39650, 39658, 39659, 39666, 39667, 43013, 43018, 43100, 43101, 43102, 43104 Health and Safety Code. Reference: Sections 38501, 38505, 38510, 38560, 38580, 39000, 39003, 39650, 39655, 43000, 43000.5, 43013, 43016, 43018, 43100, 43101,
43102, 43104, 43105, 43106, 43205, 43205.5 Health and Safety Code.

## Section 1963.1.    Advanced Clean Trucks Deficits

*Basic Requirement.* Beginning with the applicable effective dates, a manufacturer must comply with the following requirements:

(a)     *Deficit Generation.* Starting with the 2024 model year, a manufacturer accrues deficits for each on-road vehicle produced and delivered for sale in California for the model year except for vehicles counted towards compliance with 13 CCR section 1962.4. A vehicle is only eligible to generate deficits once.

(b)     *Deficit Calculation.* Deficits shall be calculated each model year. For each on- road vehicle, the deficit is calculated as the product of the model year percentage requirement from Table A-1, and the appropriate weight class modifier for each vehicle from Table A-2. Every model year, the deficits generated by each vehicle are summed for each vehicle group.

### Table A-1. ZEV Sales Percentage Schedule

| Model Year | Class 2b-3 Group | Class 4-8 Group | Class 7-8 Tractors Group |
|---|---|---|---|
| 2024 | 5% | 9% | 5% |
| 2025 | 7% | 11% | 7% |
| 2026 | 10% | 13% | 10% |

7

Electronic Filing: Received,Clerk's Office 04/28/2025 P.C. #516

| | | | |
|---|---|---|---|
| 2027 | 15% | 20% | 15% |
| 2028 | 20% | 30% | 20% |
| 2029 | 25% | 40% | 25% |

| Model Year | Class 2b-3 Group | Class 4-8 Group | Class 7-8 Tractors Group |
|---|---|---|---|
| 2030 | 30% | 50% | 30% |
| 2031 | 35% | 55% | 35% |
| 2032 | 40% | 60% | 40% |
| 2033 | 45% | 65% | 40% |
| 2034 | 50% | 70% | 40% |
| 2035 | 55% | 75% | 40% |

Table A-2. Weight Class Modifiers

| | Vehicles in the Class 2b-3 | Class 4-5 Vehicles in the Class 4-8 Group | Class 6-7 Vehicles in the Class 4-8 Group | Class 8 Vehicles in the Class 4-8 Group | Vehicles in the Class 7 and 8 Tractor Group |
|---|---|---|---|---|---|
| Weight Class Modifier | 0.8 | 1 | 1.5 | 2 | 2.5 |

(c)   *Deficit Rounding.* If the sum of deficits generated in a model year for a vehicle group is not equal to a whole number, the sum of deficits shall round up to the nearest tenth when the fractional part is equal to or greater than 0.05, and round down to the nearest tenth if less than 0.05.

(d)   *Deficit Accounting.* Deficits generated from vehicles in the Class 7-8 tractor group must be accounted separate from other deficits.

NOTE: Authority cited: Sections 38501, 38510, 38560, 38566, 39500, 39600, 39601, 39650, 39658, 39659, 39666, 39667, 43013, 43018, 43100, 43101, 43102, 43104 Health and Safety Code. Reference: Sections 38501, 38505, 38510, 38560, 38580, 39000, 39003, 39650, 39655, 43000, 43000.5, 43013, 43016, 43018, 43100, 43101, 43102, 43104, 43105, 43106, 43205, 43205.5 Health and Safety Code.

## Section 1963.2.   Advanced Clean Trucks Credit Generation, Banking, and Trading

Beginning with the 2021 model year, the following requirements apply:

(a)   *ZEV Credit Calculation.* A manufacturer earns ZEV credits for each ZEV produced and delivered for sale in California for the model year except for vehicles counted towards compliance with 13 CCR section

9

Electronic Filing: Received,Clerk's Office 04/28/2025 P.C. #516

1962.4. The ZEV credit generated for each vehicle delivered for sale is equal to the value of the

appropriate weight class modifier in Table A-2 of section 1963.1. A vehicle is only eligible to earn credits once.

(b)   *NZEV Credit Calculation.* Until the end of the 2035 model year, a manufacturer earns NZEV credits for each NZEV produced and delivered for sale in California for the model year except for vehicles counted towards compliance with 13 CCR section 1962.4. The NZEV credit generated for each vehicle delivered for sale is calculated as the product of the appropriate weight class modifier in Table A-2 of section 1963.1, and the NZEV factor value as calculated in section 1963.2(b)(1). A vehicle is only eligible to earn credits once.

   (1)   *NZEV Factor Value.* The NZEV factor used to calculate NZEV credits shall be calculated as 0.01 multiplied by the all-electric range, and is not to exceed 0.75.

   (2)   *Minimum All-Electric Range.* To earn credit, NZEVs must have an all- electric range that equals or exceeds the criteria specified in 17 CCR section 95663(d) until the end of the 2029 model year and an all-electric range that equals or exceeds 75 miles or greater starting with the 2030 model year.

(c)   *Credit Rounding.* If the calculated number of summed ZEV or NZEV credits generated in a model year for a vehicle group is not equal to a whole number, the summed number shall round up to the nearest tenth when the fractional part is equal to or greater than 0.05, and round down to the nearest tenth if less than 0.05.

(d)   *Credit Banking.* ZEV and NZEV credits may be banked for future use. Banked credits may be used to satisfy deficits per section 1963.3 and have limited lifetimes per section 1963.2(g).

(e)   *Credit Trading and Transfer.* ZEV and NZEV credits may be traded, sold, or otherwise transferred between manufacturers. ZEV or NZEV credits transferred in this manner may be used to satisfy deficits per section 1963.3 and have limited lifetimes per section 1963.2(g), and must be reported to the Executive Officer in accordance with the requirements of section 1963.4. <u>Secondary vehicle manufacturers have the option to trade, sell, or otherwise transfer ZEV and NZEV credits with manufacturers. Transferred ZEV and NZEV credits must be reported to the Executive Officer in accordance with the requirements of section 1963.4(c).</u>

(f)   *Credit Accounting.* ZEV and NZEV credits must be separately accounted for based on model year generated. NZEV credits must be accounted for separately from ZEV credits. Class 7-8 tractor group credits must be accounted for separately from other credits.

Electronic Filing: Received,Clerk's Office 04/28/2025 P.C. #516

(g)     *Limited Credit Lifetime.* ZEV and NZEV credits have limited lifetimes as
follows:

(1) *2021 to 2023 Model Year.* ZEV or NZEV credits generated in the 2021, 2022 and 2023 model years expire at of the end of the 2030 model year, and are no longer available to be used to meet compliance for 2031 and later model years. For example, ZEV or NZEV credits generated during the 2022 model year may be used to meet compliance requirements until the end of the 2030 model year, and may not be used to meet 2031 model year compliance requirements.

(2) *2024 Model Year and Beyond.* ZEV or NZEV credits generated in 2024 and subsequent model years may be used only for five model years after the model year in which they are generated. For example, ZEV or NZEV credits generated for the 2024 model year may be used to meet compliance requirements until the end of the 2029 model year, and may not be used to meet 2030 model year compliance requirements.

(h) ~~*Zero-Emission Powertrain Certification to Receive ZEV Credit for ZEVs.*~~*Heavy- Duty and Incomplete Medium-Duty Vehicles.* Beginning with the 2024 model year, heavy-duty on-road ZEVs over 14,000 pounds GVWR and incomplete medium-duty ZEVs from 10,001 through 14,000 pounds GVWR produced and delivered for sale in California must meet the requirements of the Zero-Emission Powertrain Certification Regulation in 13 CCR section 1956.8(a)(8) and 17 CCR section 95663(d) to receive ZEV credit under section 1963.2.

(i) *Certification to Receive ZEV Credit for Complete Medium-Duty Vehicles.* On- road complete medium-duty ZEVs from 8,501 through 14,000 pounds GVWR produced and delivered for sale in California must meet the requirements of either the Zero-Emission Powertrain Certification Regulation in 13 CCR section 1956.8(a)(8) and 17 CCR section 95663 ~~as amended by the Zero-Emission Powertrain and Enhanced Fuel Cell and Electric Vehicle Certification regulation,~~ or (d), 13 CCR section 1962.2, 13 CCR section 1962.4, or the certification procedures in the "California Exhaust Emission Standards and Test Procedures for 2018 and Subsequent Model Year Zero-Emission Vehicles and Hybrid Electric Vehicles, in the Passenger Car, Light-Duty Truck and Medium-Duty Vehicle Classes" as amended on September 3, 2015, which is incorporated by reference herein, to receive ZEV credit. under section 1963.2.

(ii) *No Double Counting ZEVs or NZEVs.* Manufacturers must comply with reporting requirements specified in section 1963.4(a)(10) including the vehicles they elect to be counted towards compliance with section 1962.4 ZEVs and NZEVs not claiming credits under 13 CCR section 1962.2, 13 CCR section 1962.4, or 13 CCR section 1963 may be excluded from the reporting and recordkeeping requirements of section 1963.4. For the 2024 and 2025 model years, Class 2b-3 ZEVs or NZEVs produced ~~or~~and delivered

13

Electronic Filing: Received,Clerk's Office 04/28/2025 P.C. #516

for sale in California may earn credits under 13 CCR section 1962.2, 1962.4, or 1963.2, but may not earn credits under more than one of these sections for the same vehicle.

Beginning with the 2026 model year, Class 2b-3 ZEVs or NZEVs produced and

14

Electronic Filing: Received,Clerk's Office 04/28/2025 P.C. #516

delivered for sale in California may earn credits under 13 CCR section 1962.4 or 1963.2, but may not earn credits under more than one of these sections for the same vehicle. Beginning with the 2026 model year, medium-duty ZEVs produced and delivered for sale in California for which a manufacturer elects to count the vehicle towards the requirements of 13 CCR section 1962.4 will not be counted as a ~~vehicle~~ credit nor a deficit in the determination of the manufacturer's ZEV deficit under section 1963.1. ~~Manufacturers must comply with reporting requirements specified in section 1963.4(d) including the vehicles they elect to be counted towards compliance with section 1962.4.~~

NOTE: Authority cited: Sections 38501, 38510, 38560, 38566, 39500, 39600, 39601, 39650, 39658, 39659, 39666, 39667, 43013, 43018, 43100, 43101, 43102, 43104 Health and Safety Code. Reference: Sections 38501, 38505, 38510, 38560, 38580, 39000, 39003, 39650, 39655, 43000, 43000.5, 43013, 43016, 43018, 43100, 43101, 43102, 43104, 43105, 43106, 43205, 43205.5 Health and Safety Code.

## Section 1963.3.    Advanced Clean Trucks Compliance Determination

(a)  *Annual Compliance Determination.* For each model year, compliance is achieved when the manufacturer's Class 7-8 tractor credits retired offset their Class 7-8 tractor deficits except as specified in 1963.3(c)(3) and when the manufacturer's total credits retired offset their total deficits.

(b)  *Flexibility to Make Up a Deficit.* A manufacturer that has a cumulative net deficit after the end of a given model year may use this flexibility to make up the deficit in a consecutive three-model year period. The three-model year period begins with the first model year following the model year in which the manufacturer had a net deficit. ~~Deficits carried over~~ In accordance with section 1963.3(d), up to 50 percent of the ~~subsequent~~ deficits generated in a model ~~years cannot~~ year may be made up with NZEV credits. The net deficit balance must be offset by the end of the three-model year deficit makeup period. If the net deficit balance is more than 30 percent of the deficits generated from the most recent model year, the net deficit must be reduced to below 30 percent by the end of the first ~~year~~ and second years of the makeup period. For example, a manufacturer that accrues 1,000 deficits in the 2024 model year must have a net deficit balance below 300 deficits (below 30 percent of the 1,000 deficits) by the end of the 2025 model year. and must have a deficit below 30 percent of the manufacturer's 2025 model year net deficits (added together with the deficit balance from 2024) by the end of the 2025 model year. A manufacturer making up a deficit may not transfer ZEV credits to other manufacturers until the deficit is made up by the end of a compliance year.

(c)  *Credit Retirement Order.* Credit accounts are debited using the

15

Electronic Filing: Received,Clerk's Office 04/28/2025 P.C. #516

following conventions, except as provided in section 1963.3(c)(3):

Electronic Filing: Received,Clerk's Office 04/28/2025 P.C. #516

(1)     First, credits must be retired by order of model year expiration, starting with the earliest expiring credit.

(2)     Second, credits must be retired in the following order by credit type and weight class group:

    (A)     First, Class 7-8 tractor group NZEV credits to meet Class 7-8 tractor group deficits up to the cap specified in 1963.3(d);

    (B)     Second, Class 2b-3 group and Class 4-8 group NZEV credits to meet Class 2b-3 group and Class 4-8 group deficits up to the cap specified in 1963.3(d);

    (C)     Third, Class 7-8 tractor group NZEV credits to meet Class 2b-3 group and Class 4-8 group deficits;

    (D)     Fourth, Class 7-8 tractor group ZEV credits to meet Class 7-8 tractor group deficits;

    (E)     Fifth, Class 2b-3 group and Class 4-8 group ZEV credits to meet Class 2b-3 and Class 4-8 group deficits; and

    (F)     Sixth, Class 7-8 tractor group ZEV credits to meet Class 2b-3 group and Class 4-8 group deficits.

(3)     *Low Tractor Volume Flexibility.* A manufacturer who generates 25 or fewer Class 7-8 tractor deficits in a model year and has tractor deficits remaining after retiring credits per the credit retirement order in sections 1963.3(c)(1) and 1963.3(c)(2) can use a maximum of 25 Class 2b-3 or Class 4-8 group ZEV credits, starting with the earliest expiring credits, to satisfy their Class 7-8 tractor group deficits.

(d)   *NZEV Credit Limit.* A manufacturer may use NZEV credits to satisfy, at maximum, 50 percent of the annual summed deficits for the Class 2b-3 group and the Class 4-8 group, and may use Class 7-8 tractor NZEV credits to satisfy, at maximum, 50 percent of the annual summed deficits for the Class 7-8 tractor group.

(e)   *Tractor Deficits Must Be Met With Tractor Credits.* Annual deficits accrued in the Class 7-8 tractor group can only be met with Class 7-8 tractor credits, except as described in section 1963.3(c)(3).

(f)   *Compliance Determination.* Compliance by the end of each model year is achieved when the cumulative credits exceed the total net deficits retired in prior model years. A manufacturer's compliance status for a given model year is determined based on the reported sales of vehicles delivered for sale

17

Electronic Filing: Received,Clerk's Office 04/28/2025 P.C. #516

in California.

Electronic Filing: Received,Clerk's Office 04/28/2025 P.C. #516

NOTE: Authority cited: Sections 38501, 38510, 38560, 38566, 39500, 39600, 39601, 39650, 39658, 39659, 39666, 39667, 43013, 43018, 43100, 43101, 43102, 43104 Health and Safety Code. Reference: Sections 38501, 38505, 38510, 38560, 38580, 39000, 39003, 39650, 39655, 43000, 43000.5, 43013, 43016, 43018, 43100, 43101, 43102, 43104, 43105, 43106, 43205, 43205.5 Health and Safety Code.

**Section 1963.4.    Advanced Clean Trucks Reporting and Recordkeeping**

(a)    *Sales Reporting.* Beginning with the 2021 model year, and no later than 90 days following the end of each model year, a manufacturer must report the following information to CARB for each on-road vehicle produced and delivered for sale in California for each model year until all vehicles designated by a given model year have been delivered for sale, except as provided in section 1963.4(e):d). Beginning with the 2027 model year, the information described in sections 1963.4(a)(13-15) is optional to report unless the information is requested by the Executive Officer:

(1)    Vehicle Identification Number (VIN) for each vehicle;

(2)    Vehicle weight class category (2b, 3, 4, 5, 6, 7, 8);

(3)    Vehicle family name;

(4(4   Applicable engine family name or zero-emission powertrain family name;

(5)    Whether the vehicle is an incomplete or complete vehicle;

(56)    Whether the vehicle type is a tractor, yard tractor, excluded bus, school bus, cutaway vehicle, or other;

(67)    Fuel type;

(78)    Advanced technology type (BEV, FCEV, NZEV, other);

(89)    If the vehicle is a NZEV, the tested all-electric range of the

vehicle; (9(10) Whether the ZEV is certified to the Zero-Emission

Powertrain
        Certification Regulation in 13 CCR section 1956.8(a)(8) and 17 CCR section 95663(d) (yes or no);

(11)    Whether the Class 2b-3 ZEV or NZEV will be excluded from ACT credit and deficit calculations (yes or no);

19

Electronic Filing: Received,Clerk's Office 04/28/2025 P.C. #516

    (12)    <u>Whether the reporting manufacturer is exempt under the Low Volume Exemption as provided in section 1963(e) (yes or no);</u>

    (13)    Latest status of delivery into California (to a dealer, secondary vehicle manufacturer, ultimate purchaser, or other);

20

Electronic Filing: Received, Clerk's Office 04/28/2025 P.C. #516

(~~10~~14) Name of the person or entity that is the vehicle's recipient; and

(~~11~~15) Physical address, including the street address, city, state, and zip code, of the vehicle's last known delivery destination.

(b)   *Reporting Updates.* ~~Reported~~A manufacturer may update a vehicle report for up to three previous model years should a manufacturer determine that a vehicle is or is not delivered for sale in California. All other reported information may be corrected or updated no later than 180 calendar days following the end of the initial 90-day report period as provided in section 1963.4(a).

(c)   *Credit Transfer Reporting.* A manufacturer or secondary vehicle manufacturer that transfers ZEV or NZEV credits to or receives ZEV or NZEV ~~added~~ credits from another manufacturer or secondary vehicle manufacturer must submit to the Executive Officer ~~an annual~~a report of all credit trades, transfers, and transactions. CARB will not recognize any credit transfers until the date the report is received.

   (1)   *Transfer Reporting Deadline.* Reports must be submitted no later than 90 days following the ~~end of each model year to demonstrate compliance~~credit transaction date.

   (2)   *Required Credit Transfer Information.* Manufacturers or secondary vehicle manufacturers that transfer or receive ZEV or NZEV credits must submit a letter or document signed by authorized agents of both parties   to the transaction summarizing the transfer, which must include the following:

      (A)   Corporate name of credit transferor;

      (B)   Corporate name of credit transferee;

      (C)   Number of ZEV credits transferred for each model year, rounded to the nearest tenth per 1963.2(c);

      (D)   Number of NZEV credits transferred for each model year, rounded to the nearest tenth per 1963.2(c); and

      (E)   Indicate whether the ZEV or NZEV credits are Class 7-8 Tractor credits, or other credits.

(d)   ~~*Class 2b-3 Credit Declaration.* A manufacturer that generates ZEV or NZEV credits from the Class 2b-3 group must submit no later than 90 days following the end of each model year a declaration to the Executive Officer which  includes:~~

Electronic Filing: Received,Clerk's Office 04/28/2025 P.C. #516

(1) The number of on-road vehicles produced and delivered for sale in California to generate credits per section 1963.2; and

(2) The number of on-road vehicles produced and delivered for sale in California to generate credits per 13 CCR section 1962.2.

(e) *Retention of Records.* Records of reported information required in section 1963.4, the manufacturer's Statement of Origin, and documentation showing vehicles are produced and delivered for sale in California must be kept by manufacturers and secondary vehicle manufacturers for CARB to audit for a period of eight (8) years from the end of the model year the vehicles were produced. Acceptable documentation for tracking vehicles produced and delivered for sale includes at least one of the following:

(1) An invoice, receipt, contract, or purchase order frombetween the manufacturer and ultimate purchaser that shows the delivery destination to an ultimate purchaser in California;

(2) An invoice, receipt, contract, or purchase order frombetween the manufacturer and dealership that shows the delivery destination to a dealership in California;

(3) A new vehicle registration in California;

(4) DocumentationAn invoice, receipt, contract, or purchase order from a secondary vehicle manufacturer showing delivery of the manufacturer's vehicle in California;

(5) An invoice, receipt, contract, or purchase order from the manufacturer that shows the delivery destination to a secondary vehicle manufacturer who must have an order from a purchaser that will take delivery of the vehicle in California;

(6) A statement from the secondary vehicle manufacturer indicating delivery of the complete vehicle to a dealership or reseller in California; or

(7) A purchase order from the fleet owner showing delivery to California.

NOTE: Authority cited: Sections 38501, 38510, 38560, 38566, 39500, 39600, 39601, 39650, 39658, 39659, 39666, 39667, 43013, 43018, 43100, 43101, 43102, 43104 Health and Safety Code. Reference: Sections 38501, 38505, 38510, 38560, 38580, 39000, 39003, 39650, 39655, 43000, 43000.5, 43013, 43016, 43018, 43100, 43101,

43102, 43104, 43105, 43106, 43205, 43205.5 Health and Safety Code.

**Section 1963.5.    Advanced Clean Trucks Enforcement**

(a)  *Enforcement of Requirements.* A manufacturer is subject to the following:

    (1)  *Audit of Records.* A manufacturer or secondary vehicle manufacturer must make records of vehicle sales into California available to the Executive Officer for audit to verify the accuracy of the reported information. In the event that records are not made available within 30 days of a request, CARB may assess penalties for noncompliance. Submitting false information is a violation of this regulation and violators will be subject to penalty.

    (2)  *Authority to Suspend, Revoke, or Modify.* If the Executive Officer finds that any ZEV or NZEV credit was obtained based on false information, the credit will be deemed invalid.

        (A)  If the Executive Officer identifies that any ZEV or NZEV is not registered or domiciled in California as reported based on the documentation provided per section 1963.4(d), the Executive Officer shall revoke the credit and the manufacturer may be subject to penalty, unless the requirements of section 1963(g) are met.

        (B)  If the Executive Officer identifies any vehicle which is newly registered with the California Department of Motor Vehicles or newly domiciled in California as a new vehicle and is not included in a manufacturer's reports, the Executive Officer shall add the deficits and the manufacturer may be subject to penalty, unless the requirements of section 1963(g) are met.

    (3)  *Public Disclosure.* Records in the Board's possession for the manufacturers subject to this regulation shall be subject to disclosure as public records as follows:

        (A)  Each manufacturer's annual vehicle sales data based on the volume of on-road vehicles produced and delivered for sale in California and the corresponding credits per vehicle earned for the 2021 and subsequent model years;

        (B)  Each manufacturer's annual credit balances for 2021 and subsequent years for ZEVs and NZEVs; and

        (C)  Credits earned under section 1963.2, including credits acquired from, or transferred to another party, and the parties themselves.

    (4)  *Penalty for Failure to Meet Credit and Deficit Requirements.* Any manufacturer that fails to retire an appropriate amount of ZEV or

24

Electronic Filing: Received,Clerk's Office 04/28/2025 P.C. #516

NZEV credits as specified in section 1963.3(c) and does not make up deficits within the specified time allowed by section 1963.3(b) shall be subject to

Health and Safety Code section 43212 civil penalty applicable to a manufacturer who does not comply with emission standards or the test procedures adopted by the state board. The cause of action shall be deemed to accrue when the deficit is not balanced by the end of the specified time allowed by section 1963.3(b). For the purposes of Health and Safety Code section 43212, the number of vehicles not meeting the state board's standards or procedures shall be equal to one half of the manufacturer's outstanding deficit.

NOTE: Authority cited: Sections 38501, 38510, 38560, 38566, 39500, 39600, 39601, 39650, 39658, 39659, 39666, 39667, 43013, 43018, 43100, 43101, 43102, 43104 Health and Safety Code. Reference: Sections 38501, 38505, 38510, 38560, 38580, 39000, 39003, 39650, 39655, 43000, 43000.5, 43013, 43016, 43018, 43100, 43101,
43102, 43104, 43105, 43106, 43205, 43205.5, 43212 Health and Safety Code.

## Section 1963.6. 2036 and Subsequent Model Year Requirements

(a)     For 2036 and subsequent model year 100 percent medium- and heavy-duty ZEV requirements, see title 13, California Code of Regulations Article 3.5, section 2016.

NOTE: Authority cited: Sections 38501, 38510, 38560, 38566, 39500, 39600, 39601, 39650, 39658, 39659, 39666, 39667, 43013, 43018, 43100, 43101, 43102, 43104 Health and Safety Code. Reference: Sections 38501, 38505, 38510, 38560, 38580, 39000, 39003, 39650, 39655, 43000, 43000.5, 43013, 43016, 43018, 43100, 43101,
43102, 43104, 43105, 43106, 43205, 43205.5, 43212 Health and Safety Code.

## Section 1956.8. Exhaust Emission Standards and Test Procedures - 1985 and Subsequent Model Heavy-Duty Engines and Vehicles and 2021 and Subsequent Zero-Emission Powertrains

*       *       *       *

(a)(8) Zero-Emission Powertrain Certification Standards. Model Year (MY) 2021 and subsequent MY all-electric and hydrogen fuel-cell powertrains used in heavy- duty vehicles (over 14,000 pounds gross vehicle weight rating) and medium duty vehicles (from 8,501 through 14,000 pounds gross vehicle weight rating) may be certified in accordance with the "California Standards and Test Procedures for New 2021 and Subsequent Model Heavy-Duty Zero-Emission Powertrains," last amended <Insert Date of Amendment>, which is hereby incorporated by reference herein. Powertrains certified using these procedures shall be deemed to have exhaust emissions of zero for any criteria pollutant or greenhouse gas.

26

Electronic Filing: Received,Clerk's Office 04/28/2025 P.C. #516

\*      \*      \*      \*

Electronic Filing: Received,Clerk's Office 04/28/2025 P.C. #516

Note: Authority cited: Sections 38501, 38505, 38510, 38560, 38580, 39500, 39600, 39601, 40000, 43013, 43018, 43100, 43101, 43102, 43104, 43105, 43106 and 43806,
Health and Safety Code; and Section 28114, Vehicle Code. Reference: Sections 38501, 38505, 38510, 38560, 38580, 39002, 39003, 39010, 39017, 39033, 39500, 39600,
39601, 39610, 39650, 39657, 39667, 39701, 40000, 43000, 43000.5, 43009, 43009.5,
43013, 43017, 43018, 43100, 43101, 43101.5, 43102, 43104, 43105, 43106, 43202, 43204, 43205, 43205.5, 43206, 43210, 43211, 43212, 43213 and 43806, Health and Safety Code; and Section 28114, Vehicle Code.

| | |
|---|---|
| **From:** | Amy Tripoli |
| **To:** | Brown, Don |
| **Cc:** | Timothy A. French |
| **Subject:** | [External] R2024-017, In the Matter of: Proposed Clean Car and Truck Standards: Proposed Section 35 Ill. Admin. Code 242 |
| **Date:** | Monday, April 28, 2025 12:44:29 PM |
| **Attachments:** | 2025 04 28 EMA Response to Petitioners" Answers to Questions Regarding Pre-Filed Testimony.pdf |

Mr. Brown:

Attached please find the Truck and Engine Manufacturers Association (EMA) comments in connection with the above-referenced matter. Please acknowledge receipt of EMA's comments by replying to this email.

If you have any questions, please do not hesitate to contact me.

Thank you,
Amy Tripoli

> Amy Tripoli
> Executive Assistant
> Phone/Fax: (312) 929-1963
> atripoli@clpchicago.com

Chicago Law Partners, LLC | 333 West Wacker Drive, Suite 810 | Chicago, IL 60606 | www.chicagolawpartners.com

**Confidentiality Notice**: This communication is confidential and may contain privileged information. If you have received it in error, please notify the sender by reply e-mail and immediately delete it and any attachments without copying or further transmitting the same.

# Exhibit B

ILLINOIS POLLUTION CONTROL BOARD
September 18, 2025

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| PROPOSED CLEAN CAR AND TRUCK | ) | R 24-17 |
| STANDARDS: PROPOSED 35 ILL. ADM. | ) | (Rulemaking - Air) |
| CODE 242 | ) | |

ORDER OF THE BOARD (by B.F. Currie, J.A. Van Wie):

On July 1, 2025, The Illinois Fuel & Retail Association, Illinois Environmental Regulatory Group, Illinois Trucking Association, Mid-West Truckers Association, and Illinois Automobile Dealers Association (Movants) jointly filed a motion for extension of time to file a motion to reconsider. The Movants ask the Board to reconsider its November 7, 2024, order denying two motions to dismiss this rulemaking. Today, the Board grants the motion for extension of time and motion for leave to file, grants the motion to reconsider but declines to modify its previous order, denies the motion for leave to file a reply, and stays this rulemaking.

## ABBREVIATED PROCEDURAL HISTORY

On June 27, 2024, the Sierra Club, Natural Resources Defense Council, Environmental Defense Fund, Respiratory Health Association, Chicago Environmental Justice Network, and Center for Neighborhood Technology (collectively, Rule Proponents) filed a rulemaking proposal asking the Board to adopt a new Part 242 of its air pollution rules. The Rule Proponents requested that the Board adopt three California motor vehicle emissions regulations addressing light-, medium-, and heavy-duty vehicles: the Advanced Clean Cars II (ACC II), Advanced Clean Trucks (ACT), and Heavy-Duty Low NOx [Nitrogen Oxide] Omnibus (Low NOx) rules.

On August 29, 2024, the Indiana, Illinois, Iowa Foundation for Fair Contracting filed a motion to dismiss the proposed rulemaking (IIIFFC Mot. to Dis.). On September 3, 2024, the Illinois Fuel & Retail Association filed a separate motion to dismiss (IFRA Mot. to Dis.). The Board considered both motions jointly and on November 7, 2024, issued an order denying the motions to dismiss (Board Order).

The Board held two sets of public hearings on this rule proposal, the first on December 2 and 3, 2024, and the second on March 10 and 11, 2025. At hearing, 83 members of the public provided oral public comments, and the Board has received 678 written public comments. Public comment was closed on May 12, 2025.

On July 1, 2025, Movants filed a motion for extension of time and motion for leave (Mot.) to file a motion for reconsideration of the Board's November 7, 2024, order. Movants attached their motion for reconsideration (Mot. for Rec.) as Exhibit 1 to their motion. The Rule Proponents filed a response (Resp.) opposing the motion for extension of time and the motion for reconsideration on July 15, 2025. On July 29, 2025, the Movants filed a motion for leave to file

a reply (Movants Reply). On August 5, 2025, the Rule Proponents filed a response to the Movants' motion for leave to file a reply (Proponent Reply Resp.).

## STATUTORY AND REGULATORY AUTHORITIES

### Board Procedural Rules

Part 101 of the Board's procedural rules addresses motions for extension of time and motions for reconsideration.:

101.522 Motions for Extension of Time

If a party's motion shows good cause, the Board or hearing officer may extend any deadline required by this Part. The motion may be filed either before or after the deadline expires. 35 Ill. Adm. Code 101.522.

101.520 Motions for Reconsideration

a) Any motion for reconsideration or modification of a Board order must be filed within 35 days after the receipt of the order. (See Section 101.902.)
b) Any response to a motion for reconsideration or modification must be filed within 14 days after the filing of the motion.
c) A timely-filed motion for reconsideration or modification stays the effect of the order until final disposition of the motion. 35 Ill. Adm. Code 101.520.

Part 102 of the Board's procedural rules for rulemaking proceedings addresses dismissal.

Section 102.212 Dismissal

a) Failure of the proponent to satisfy the content requirements for proposals under this Subpart or failure to respond to Board requests for additional information will render a proposal subject to dismissal for inadequacy.
b) Failure of the proponent to pursue disposition of the proposal in a timely manner will render a proposal subject to dismissal. In making this determination, the Board will consider factors including the history of the proceeding and the proponent's compliance with any Board or hearing officer orders.
c) A proposal will be dismissed for inadequacy in cases in which the Board, after evaluating the proposal, cannot determine the statutory authority on which the proposal is made. Dismissal of a proposal will not bar a proponent from resubmitting a proposal in the absence of any deadline imposed by applicable law or Board regulations.
d) Any person may file a motion challenging the statutory authority or sufficiency of the proposal under 35 Ill. Adm. Code 101.Subpart E. 35 Ill. Adm. Code 101.212.

**Clean Air Act**

In 1965, California created its own emission control program.  In 1967, Congress enacted the Clean Air Act (CAA) and granted California the ability to adopt and enforce separate motor vehicle emission standards due to the unique air quality problems that faced southern California. Ford Motor Co. v. EPA, 606 F.2d 1293, 1294 (D.C. Cir. 1979), *citing* H.R. Rep. No. 90-728, 90th Cong., 1st Sess. 21 (1967) (Ford Motor Co.).

Under the Clean Air Act, California may request a waiver to implement a state-level regulatory program for new motor vehicles or their engines.  42 U.S.C. § 7543(b), (e).  Section 177 of the Clean Air Act allows states, under certain conditions, to use California's emission control standards.

Section 177 of the Clean Air Act provides as follows:

Notwithstanding section 7543(a) of this title, any State which has plan provisions approved under this part may adopt and enforce for any model year standards relating to control of emissions from new motor vehicles or new motor vehicle engines and take such other actions as are referred to in section 7543(a) of this title respecting such vehicles if—

(1)     such standards are identical to the California standards for which a waiver has been granted for such model year, and

(2)     California and such State adopt such standards at least two years before commencement of such model year (as determined by regulations of the Administrator).   42 U.S.C. § 7507.

**Recent Federal Actions**

Recently, Congress "disapproved" the three California standards the Rule Proponents propose that the Board adopt in this rulemaking.  The three joint resolutions of Congress are H.J. Res. 87 (referencing ACT), 88 (referencing ACC II) and 89 (referencing Low NOx) (collectively, Joint Resolutions).   These resolutions were signed into law by the President on June 12, 2025. *See*, Public Law 119-15, 119-16, 119-17.  The three resolutions mirror each other, and Resolution 87 for example, says, in part, as follows:

Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, that Congress disapproves the rule submitted by the Environmental Protection Agency relating to "California State Motor Vehicle and Engine Pollution Control Standards;  Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance Provisions; Advanced Clean Trucks; Zero Emission Airport Shuttle; Zero-Emission Power Train Certification; Waiver of Preemption; Notice of Decision" (88 Fed. Reg. 20688 (April 6, 2023)), and such rule shall have no force or effect.  H.J. Res 87.

On June 12, 2025, California, along with ten other states that have adopted these rules, filed suit in the Northern District of California to oppose this Congressional action. State of California, et. al v. United States, et. al, No. 4:25-cv-04966-HSG (N.D. Cal., filed June 12, 2025). The case is ongoing, and the Court has set an initial hearing for October 23, 2025.

## MOTION FOR EXTENSION AND FOR LEAVE TO FILE MOTION FOR RECONSIDERATION

### Movants' Motion for Leave to File Reply

The Board's rules provide that "[t]he moving person will not have the right to reply, except as the Board or the hearing officer permits to prevent material prejudice." 35 Ill. Adm. Code 101.500(e). Here, the Movants argue they would be materially prejudiced if they are not permitted to reply so that they may respond to assertions they believe are incorrect. Movants Reply at 2-3. The Rule Proponents ask that the Board deny the motion for leave to file a reply as "[m]ere disagreement does not amount to material prejudice." Proponent Reply Resp. at 1. The Board agrees. In evaluating the motion for leave to file a reply, the Board finds no evidence of material prejudice. The list of issues upon which the Movants based their motion are all present in their initial motion, and the Movants simply expand upon their reasoning in their reply. Therefore, the Board denies the Movants' motion for leave to file a reply and declines to consider the reply in deciding Movants' motions.

### Movants' Motion for Extension of Time and Motion for Leave to File

The Board will consider the motion for extension of time and motion for leave to file separately from the motion for reconsideration.

The Movants first request an extension of time and leave to file the underlying motion for reconsideration. Mot. at 1. The Board's rules allow for motions of extension of time if the party shows good cause. Here, the Movants argue that recent Congressional action has eliminated the basis of the proposed rulemaking, and this action constitutes good cause to request the Board reconsider its denial of the motions to dismiss. Id. at 5. Movants also argue that their motion was filed within 35 days of the "enactment of the new law that is the basis of the request for reconsideration." Id. at 6.

The Rule Proponents argue that this motion is procedurally improper. The Rule Proponents ask that the Board deny both the motion for extension of time and the motion to reconsider and in the alternative, treat the filings as a late-filed public comment and "afford it only whatever consideration is appropriate for untimely comment submissions." Resp. at 2. The Rule Proponents argue that the Congressional actions are unlawful and therefore do not merit reconsideration. Id. at 8.

### Board Discussion and Findings

The Board has wide discretion in determining "good cause" in motions for extension of time. People of the State of Illinois v. Environmental Health and Safety, Inc., PCB 05-51, slip

op. at 3 (April 6, 2006), *citing* <u>Bright v. Dicke</u>, 166 Ill. 2d 204 (1995). In past Board cases, "good cause" has extended to parties gathering additional information and requiring further time to file an amended petition. *See*, <u>Silbrico Corp. v. IEPA</u>, PCB 06-11, slip op. at 1 (Oct. 20, 2005).

The Board is not the proper venue to determine the legality of Congress's actions regarding the California Air Resources Board (CARB) waivers. That issue is the subject of the ongoing suit before the Northern District of California. Here, the Board must acknowledge that on June 12, 2025, Congress and the Presidential administration took actions that fundamentally change the landscape of Section 177 of the Clean Air Act. The Board finds these recent actions rise to the level of "good cause" in 35 Ill. Adm. Code 101.522. Therefore, the Board agrees with the Movants that the recent Congressional actions constitute good cause and grants the motion for extension of time and motion for leave to file the motion for reconsideration.

### Movants' Motion for Reconsideration

In ruling on a motion for reconsideration, the Board will consider factors including new evidence or a change in the law to conclude that the Board's decision was in error. 35 Ill. Adm. Code 101.902. The Board has previously held that "the intended purpose of a motion for reconsideration is to bring to the court's attention newly discovered evidence which was not available at the time of hearing, changes in the law, or errors in the court's previous application of the existing law." <u>Sierra Club, Environmental Law and Policy Center, Prairie Rivers Network, and Citizens Against Ruining the Environment v. Midwest Generation</u>, LLC, PCB 13-15, slip op. at 8-9 (Feb. 6, 2020), *citing* <u>Korogluyan v. Chicago Title & Trust Co.</u>, 213 Ill. App. 3d 622, 627 (1st Dist. 1992); *see also* <u>Citizens Against Regional Landfill v. County Board of Whiteside</u>, PCB 92-156, slip op. at 2 (Mar. 11, 1993). A motion to reconsider may also specify "facts in the record which were overlooked." <u>Wei Enterprises v. IEPA</u>, PCB 04-23, slip op. at 3 (Feb. 19, 2004).

### Board Discussion and Findings

### Movants Allege a Recognized Ground to Reconsider

In support of their motion to reconsider, Movants argue that the Joint Resolutions signed into law by the President on June 12, 2025, constitute a change in law that nullifies the waivers allowing California to enact its own emission standards and, consequently, now prevents other states from adopting and enforcing emissions standards set by CARB. Mot. at 6; Mot. for Rec. at 10. As noted, a change in the law is a recognized ground for reconsideration. *See* <u>Sierra Club et al.</u>, PCB 13-15, slip op. at 8-9 (*citing* <u>Korogluyan</u> at 627 (1st Dist. 1991)).

### Movants Make a New Argument

A motion to reconsider must do more than merely reiterate arguments already made by the movant and rejected by the Board. The Movants ask that the Board reconsider its November 7, 2024, decision that denied two motions to dismiss this rulemaking. The Movants argue that the basis for the Board to adopt the three proposed California standards is, "entirely dependent

upon the exception to federal preemption remaining applicable… [I]f the proposed standards are not 'California standards for which a waiver has been granted,' then no State could adopt those standards under any circumstance." Mot. for Rec. at 10.

The Movants cite the language of Section 177 of the Clean Air Act to support their argument that the Congressional action removed Illinois' authority to adopt the California rules. "The only authority Illinois, or any State, has to adopt vehicle emissions standards is to adopt 'standards that are identical to the California standard *for which a waiver has been granted*.'" Mot. for Rec. at 12, *citing* 42 U.S.C. § 7507 (emphasis by Movants). Since the Joint Resolutions declared that the three rules shall have "no force or effect," Movants argue that ACC II, ACT, and Low NOx rules "are no longer 'California standards *for which a waiver has been granted*.'" *Id*. (emphasis by Movants). Movants argue that the Joint Resolutions invalidated any waiver granted to California and that the Board is prohibited from adopting and enforcing these California standards. *Id*. at 13.

The Rule Proponents argue the motion for reconsideration is improper because it "seeks to relitigate the motion to dismiss phase – more than eight months after the Board resolved it." Resp. at 3. The Rule Proponents set forth that the Board's rulemaking authority under the Environmental Protection Act (Act) has not changed since the initial motions to dismiss were filed in the matter. *Id*. at 4. Additionally, the Rule Proponents claim that Movants' arguments concerning the Board's authority under the Clean Air Act have already been considered by the Board and addressed in the record. *Id*.

While the motion to dismiss filed by the Indiana, Illinois, Iowa Foundation for Fair Contracting did raise arguments concerning the Board's authority to consider this proposal under the Clean Air Act, those arguments did not address federal preemption in the event of Congress altering the availability or enforceability of the waivers for the ACC II, ACT and Low NOx rules. The issue of whether the waivers are valid following the passage of the Joint Resolutions which declared the waivers to have "no force or effect" is now before the Board for the first time.

## Movants Timely Raise a New Argument for the First Time

The Joint Resolutions were signed into law by the President on June 12, 2025. Movants filed their motion for reconsideration on July 1, 2025. Because the new argument relies on changes made by the Joint Resolutions, it could not have been made prior to their enactment on June 12, 2025. Accordingly, the Movants timely raised a new argument for reconsideration.

## Movants Establish a Recognized Ground to Reconsider

Movants argue that the Joint Resolutions constitute a change in the law upon which this rulemaking proposal is based. Mot. for Rec. at 9. First, Movants note that the Joint Resolutions were passed by both houses of Congress and approved and signed by the President on June 12, 2025, and consistent with the process of bicameralism and presentment, have the full force and effect of law. *Id*. at 12. The Joint Resolutions "disapprove" recent grants of waivers for the ACC II, ACT, and Low NOx rules, and establish that the waivers "shall have no force or effect". *Id*. at

10; *see* Public Law No. 119-15, 119-16, 119-17 (Jun. 12, 2025). Movants aver that this change "nullifies the entire basis for this rulemaking." *Id.* at 12.

The Rule Proponents contend that the Joint Resolutions were unlawful Congressional Review Act resolutions and therefore do not constitute a change in law that eliminated the waivers. Resp. at 3-4. Rule Proponents argue that because the Congressional actions are unlawful, in their view, States' ability to adopt and enforce California standards are unaffected. Resp. at 5.

Initially, while the Board notes the ongoing California legal challenge to the Joint Resolutions, the Board reiterates that the Board is not the proper forum to determine whether the Joint Resolutions were lawfully enacted. Given the record and caselaw now before the Board, the Board must proceed with this analysis assuming that the Joint Resolutions were properly enacted through compliance with the processes of bicameralism and presentment and have the full force of law. *See* Mot. for Rec. at 11-12, *citing* Ctr. for Biological Diversity v. Bernhardt, 946 F.3d 553, 562 (9th Cir. 2019) ("Congress complied with the process of bicameralism and presentment in enacting the Joint Resolution, because the Joint Resolution passed both houses of Congress and was signed by the President into law. By enacting the Joint Resolution, Congress amended the substantive environmental law and deprived the [federal rule at issue] of any force or effect. Accordingly, the Joint Resolution is enforceable as a change to substantive law, even though it did not state that it constituted an amendment to the [federal statutes at issue]."). The Joint Resolutions clearly alter the availability of the California waivers for the ACC II, ACT and Low NOx rules. The Board finds that Movants have established that the Joint Resolutions constitute a change in the law and therefore grants the motion for reconsideration.

## On Reconsideration, the Board Affirms Its November 7, 2024 Order

The Rule Proponents argue that the status of a California waiver is irrelevant to states' ability to adopt and enforce the CARB rules. Resp. at 5-6. Rule Proponents support their argument by likening this congressional action to an "interpretation of the CAA" and cite cases holding that, while waiting for USEPA to approve a California waiver, states can adopt the California standards but must wait to enforce the standards until a waiver has been granted. *Id.*; *see, e.g.*, American Automobile Manufacturers Association, et. al v. Greenbaum, 1993 U.S. Dist. LEXIS 15337 (D. Mass. Oct. 27, 1993) (Am. Auto. v. Greenbaum); Motor Vehicle Manufacturers Ass'n. v. New York State Department of Environmental Conservation, 810 F. Supp. 1331, 1348 (N.D.N.Y. 1993) (Motor Vehicle Manufacturers); Minn. Auto Dealers Ass'n. v. Minn. Pollution Control Agency, 520 F. Supp. 3d 1126, 1137 (D. Minn 2021) (Minn. Auto Dealers).

Specifically, Rule Proponents point to two cases that discuss other states' ability to adopt, but not enforce, California standards while waiting for USEPA to grant a waiver for the CARB standard. In Am. Auto. v. Greenbaum, the plaintiffs challenged Massachusetts' adoption of a California standard under Section 177 of the Clean Air Act. 1993 U.S. Dist. LEXIS 15337 (D. Mass. Oct. 27, 1993). There, the District Court decided a motion from the plaintiffs for a preliminary injunction and in so doing, evaluated the likelihood of success of the seven counts of the complaint, one of which involved USEPA waivers. Am. Auto. v. Greenbaum at *27. The

plaintiffs argued that "Section 177(1) permits states to adopt and enforce only those California standards that have *already* obtained a federal waiver […]" *Id*. (emphasis in original). Massachusetts had adopted a standard before USEPA granted California a waiver for the standard and just over one year after Massachusetts adopted the standard, USEPA granted the waiver. *Id*. Massachusetts argued that Section 177 should be read to allow states to adopt the California standards prior to USEPA granting a waiver, but only allow enforcement of the standards after the waiver was granted. *Id*. at *29.

The court in Greenbaum looked to a factually similar New York District Court case that evaluated the purpose of Section 177 in considering a state's ability to adopt versus enforce California emissions standards prior to USEPA granting a waiver for the standards. *See* Motor Vehicle Manufacturers at 1348 (finding on summary judgment that Section 177 did not preclude New York from *adopting* California standards before USEPA issued a waiver for those California standards). The Greenbaum court noted that, while Massachusetts' "arguments on this point are less than overwhelming, they did persuade the only other court to consider this question [in the New York case]" and determined, in the context of the motion for preliminary injunction, that the plaintiffs did not show a likelihood of success on this issue. Am. Auto v. Greenbaum. at *29. On appeal to the First Circuit, however, the plaintiffs dismissed their appeal as to the waiver issue. American Automobile Manufacturers Ass'n. v. Commissioner, Massachusetts Department of Environmental Protection, 31 F.3d 18, 22 (1st Cir. 1994).

The Motor Vehicle Manufacturers plaintiffs appealed the decision of the New York District Court. *See* Motor Vehicle Manufacturers Ass'n. of the United States v. New York State Department of Environmental Conservation, 17 F.3d 521, 534 (2d Cir. 1994). On appeal, the Second Circuit made a similar determination as the lower courts:

> The issue is what do the above quoted words of § 177 mean, that is to say, what is the waiver a precondition to – [the Department of Environmental Conservation]'s adoption of the [California Low Energy Vehicle] plan or DEC's enforcement of the [California] LEV plan or both. The most sensible response, it appears to us, is that the waiver is a precondition to enforcement of the standard that has been adopted. In other words, it is sensible for DEC to adopt the standards prior to the EPA's having granted a waiver, so long as the DEC makes no attempt to enforce the plan prior to the time when the waiver is actually obtained. Motor Vehicle Manufacturers Ass'n. of the United States v. New York State Department of Environmental Conservation, 17 F.3d 521, 534 (2d Cir. 1994).

The Board finds the question before it in this rulemaking to be factually different from the situations in the Massachusetts and New York cases cited above, and distinguishable from the Rule Proponents' reliance on them. In those cases, the states had adopted a California standard while waiting for USEPA approval of the waiver for the standard. During that time, the federal courts determined states could adopt the California standard, but they could not enforce the standard until the waiver was granted. Here, the Board is faced with an entirely different situation. The Board is not waiting for USEPA approval of a waiver, or an "interpretation" of a waiver's terms – Congress has eliminated the waivers for ACC II, ACT, and Low NOx as of June 12, 2025. This is instead a clear act of Congress that constitutes a change in the substantive law upon which the waivers are based.

Rule Proponents also cite to <u>Ford Motor Co.</u> to argue that states can adopt California emissions standards regardless of USEPA or federal actions.  Resp. at 6.  However, <u>Ford Motor Co.</u> analyzes Congress' intent amending the Clean Air Act in 1977 where the Court found amendments "significantly altered the California waiver provision and the relationship between California and federal emission control standards."  <u>Ford Motor Co. v. EPA</u>, 606 F.2d 1293, 1300 (D.C. Cir. 1979).  After the 1977 congressional amendment to the Clean Air Act changed California's waiver for emission standards to allow California to implement certain emissions standards not necessarily more stringent than federal standards, plaintiff Ford brought a complaint against the USEPA administrator for implementing the changed waiver thus disallowing Ford from selling California-equipped cars outside California.  Ford argued that it should be allowed to continue complying with California's old "more stringent" emission standards to sell its cars outside of California rather than with the amended standards.  Critical to the Court's determination was that the amendment to Section 209(b) changed the waiver from requiring California's standards to be "more stringent" than federal standards to obtain a waiver of federal preemption, to language that permits California to obtain the waiver, so long as it determines that its emission control standards would be, "[i]n the aggregate, at least as protective of public health and welfare as applicable Federal standards."  <em>See</em> <u>Ford Motor Co.</u> at 1296-1297 (<em>quoting</em> Section 209(b) of the Clean Air Act, 42 U.S.C. § 7543(b) (Supp. I 1977)).  The Court determined that Ford challenged USEPA's implementation of a congressional determination in the wrong forum – the Court, rather than Congress – stating, "EPA did not promulgate a new rule, it merely recognized and effectuated changes wrought by Congress.  However meritorious Ford's position with regard to those changes may be, it was then and is now being presented to the wrong forum.  Neither the Administrator nor this court is free to reverse the congressional determination."  <u>Ford Motor Co.</u> at 1300.

<u>Ford Motor Co.</u> requires the courts to abide by the congressional intent when interpreting Section 177.  The Court's holding that there is no requirement to conduct a separate waiver proceeding for each state adopting California standards relied on Congress's intent in amending Section 177 and the terms of the California waiver.  <em>See</em> <u>Ford Motor Co.</u> at 1297-1298 (finding Congress's decision to "expand and strengthen the California waiver provision" to "afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare").  As of now, the Joint Resolutions to give the ACC II, ACT, and Low NOx waivers "no force or effect" constitute significant alterations to the California waiver provision and the relationship between California and federal emission control.  Congress has made its intent known in the Joint Resolutions.  The Board has found that the enactment of the Joint Resolutions constitutes a change in the law authorizing states to adopt and enforce "California standards for which a waiver has been granted."  However, the ultimate outcome of this change, and its effect on proceeding with this rulemaking, is the subject of the court challenge filed in California.

Importantly, Movants ask the Board to reconsider an original motion to dismiss that challenged the Board's statutory authority to consider this rulemaking proposal.  <em>See</em> IIIFFC Mot. to Dis. at 2, 8; IFRA Mot. to Dis. at 2.  The Movants dispute the Rule Proponents' position that the Board is authorized to consider and adopt the proposal under the Clean Air Act.  Board Order at 7.  In its original order on the motions to dismiss, the Board determined that the proposal was

made on the Board's authority under Section 10 of the Act, noting it had previously considered adopting California emissions standards on its own motion. *Id.* at 5-6, 8; *see also* Application of California Motor Vehicle Control Program in Illinois, R89-17(C) (Oct. 11, 1990). Section 10 of the Act authorizes the Board to "adopt regulations to promote the purposes of this Title," including on the "[s]tandards and conditions regarding the sale, offer, or use of any fuel, vehicle, or other article determined by the Board to constitute an air pollution hazard." 415 ILCS 5/10(A), (A)(d) (2024). While the Joint Resolutions "disapproving" the waivers may affect the authority of states to adopt and enforce "California standards for which a waiver has been granted" under Section 177 of the Clean Air Act, the Board finds that this does not constitute a change to the Board's statutory authority under Section 10 of the Act to consider this rulemaking proposal. The Board is not persuaded that it is necessary to modify its finding of jurisdiction in its November 7, 2024, order.

In its original denial of the motions to dismiss, the Board addressed the Rule Proponents' position that the proposal is consistent with the Clean Air Act requirement that "all new motor vehicles sold in the U.S. [] be certified to the emissions standards set by either the U.S. Environmental Protection Agency or the State of California" and Section 177's authorization of states to adopt California standards. Board Order at 7, *citing* 42 U.S.C. §§ 7521, 7543. The Board was not convinced that the Rule Proponents' reliance on the Clean Air Act required granting the motion to dismiss, given its established authority to consider the proposal under Section 10 of the Act. While the Board agrees that the federal Joint Resolutions constitute a change in law relevant to this rulemaking proceeding, the Board is not convinced that the Joint Resolutions change its authority to consider this proposal under Section 10 of the Act to require dismissing the proposal. The Board therefore declines to modify its November 7, 2024, order, and affirms its denial of the motions to dismiss. As the Board said in its original denial of the motions to dismiss, jurisdiction can be challenged at any point in the proceeding. Board Order at 4; 35 Ill. Adm. Code 102.212(d).

The Board notes that while the Joint Resolutions do not constitute a change to the Board's authority to consider this rulemaking under the Act, the enactment into law of the Joint Resolutions "disapproving" the waivers for ACC II, ACT, and Low NOx calls into question the availability of the Section 177 waiver authorization giving states the ability to adopt and enforce the standards. The ongoing California lawsuit challenging the legality of the Joint Resolutions also raises valid questions about the legality of the Joint Resolutions.

## Staying the Rulemaking Proceeding

Because the Board finds that the California suit raises questions on the legality of the Joint Resolutions, the Board will stay this rulemaking until the conclusion of the ongoing California suit, State of California, et. al v. United States, et. al, or until the Board orders otherwise. *See*, Indian Refining Limited Partnership, et al v. Illinois EPA, PCB 91-84, slip op. at 1 (Aug. 13, 1992), Velsicol Chemical Corp. v. IEPA, PCB 78-171, slip op. at 1 (June 22, 1978). Without commenting on the merits of the California case, the Board acknowledges that its ability to adopt California motor vehicle standards is derived from Section 177 of the Clean Air Act. In its initial order on the motions to dismiss, the Board held that its statutory authority to consider any rulemaking is derived from Section 10 of the Act. Board Order at 8. That remains true.

However, the Joint Resolutions of Congress "disapproving" the ACC II, ACT, and Low NOx waivers call in to question whether States have the ability to adopt and enforce CARB standards which Congress has "disapproved". That question is the subject of the ongoing California suit. The Board must wait until this active legal issue is resolved before moving forward in this rulemaking.

The Board makes clear that in issuing this stay, it is not taking a position on the merits of the proposed rulemaking in any way. Rather, the Board recognizes the robust record created so far in this rulemaking – two multi-day hearings, testimony from multiple witnesses at hearing, and a vast amount of information provided to the Board, which includes hundreds of comments, oral and written, from members of the public. Staying the rulemaking while the Courts determine the fate of the waivers allows the Board to preserve resources during this pause. Additionally, the Board notes to participants that it continues to have questions on how this proposed rule would work in Illinois. Those questions include issues surrounding the motor vehicle tax, the administrative duties that would be assigned to the Secretary of State, infrastructure concerns, and the actual costs to the public to implement or not implement the rules. When the Board lifts this stay, it intends to (1) evaluate the Section 177 requirements and determine whether Illinois has met those requirements, and (2) proceed with further discussion on other issues prior to deciding whether to move to first notice or dismiss the rulemaking.

Therefore, on its own motion, the Board stays this rulemaking and directs Movants and Rule Proponents to provide status updates every six months, beginning on March 5, 2026. Other participants may file status updates on this same schedule. If California is successful in its suit and the waivers are reinstated, the Board anticipates it will pose additional questions to participants when the stay is lifted.

## ORDER

1.     The Board denies Movants' motion for leave to file a reply.

2.     The Board grants the Movants' motion for extension of time and motion for leave to file the motion for reconsideration.

3.     The Board grants the Movants' motion for reconsideration of the Board's denial of the motions to dismiss, and on reconsideration affirms its November 7, 2024 order.

4.     The Board stays this rulemaking until the resolution of <u>State of California, et. al v. United States, et. al</u>, No. 4:25-cv-04966-HSG (N.D. Cal., filed June 12, 2025) or until the Board orders otherwise. Movants and Rule Proponents are to file written status updates every six months, beginning on March 5, 2026. Other participants may file status updates on this same schedule.

12

IT IS SO ORDERED.

I, Don A. Brown, Clerk of the Illinois Pollution Control Board, certify that the Board adopted the above order on September 18, 2025, by a vote of 5-0.

_Don A. Brown_

Don A. Brown, Clerk
Illinois Pollution Control Board